ÁUREA E. TORRES PONCE, demandante y recurrida, *v.* ENRIQUE JIMÉNEZ y OTROS, demandados y recurrentes.

Número: R-81-161 Resuelto: 2 de junio de 1982

*Daniel R. Domínguez*, abogado de los recurrentes; *Rafael Humberto Marchand*, abogado de la recurrida.

El Juez Asociado Señor Dávila emitió la opinión del Tribunal.

Se recurre de una sentencia que ordenó reponer a la demandante en su empleo con el pago de los salarios dejados de percibir desde que fue cesanteada y cualquier otro beneficio a que tuviera derecho. El tribunal de instancia formuló las siguientes determinaciones de hecho, sobre las cuales no existe controversia alguna. La demandante comenzó a prestar sus servicios a la Puerto Rico Telephone Co. desde abril de 1972. Trabajó durante siete años consecutivos y recibió continuos ascensos por su labor.[1] La demandante no es miembro de la Unión que representa a los empleados de la Telefónica porque su puesto no cae dentro de la categoría de la unidad apropiada. Forma parte de los empleados gerenciales. Al momento del despido se desempeñaba como empleada regular. Había aprobado el período probatorio. Ocupaba el puesto de contadora. El 9 de octubre de 1978 fue despedida sumariamente sin celebrarse vista. Acudió a los tribunales.

El 30 de octubre de 1978, recibida demanda de *injunction*, el tribunal señaló vista para el 28 de noviembre de 1978. El mandamiento fue diligenciado cumpliendo con los requisitos de ley. El 28 de noviembre la parte demandada presentó moción de desestimación. Las partes se reunieron en cámara. Varios documentos fueron presentados en evidencia por ambas partes. En la minuta aparece que se les concedió treinta días para someter memorandos de derecho

---

[1] *Exhibits* 2 y 3 — Copia del expediente de personal que refleja las fechas de los ascensos y aumentos de sueldos periódicos.

*Exhibit* 4 — Carta con fecha de 7 de junio de 1975, del Presidente de la Corporación en que manifiesta su agradecimiento por el extraordinario esfuerzo realizado por la demandante en sus labores.

*Exhibit* 5 — Carta con fecha de 27 de mayo de 1977 del Presidente de la Corporación en que expresa su agradecimiento a la demandante por su continua dedicación, aumentándole el sueldo a $7,809.

y diez días a la demandada a partir de recibir la notificación del memorando de derecho del demandante para contestar la demanda.

■ La acción de *injunction* al amparo del Art. 678 del Código de Enjuiciamiento Civil, según enmendado, 32 L.P.R.A. sec. 3524(3)[2] dispone que se tramitará conforme a los términos de la Regla 57.1 de Procedimiento Civil.[3] La Regla 57.1 dispone que no se expedirá ningún auto de *injunction* preliminar sin notificación previa a la parte adversa y que las vistas para considerar un *injunction* preliminar y uno permanente pueden consolidarse. La Regla 57.1 corresponde a la 65(a) de Procedimiento Civil federal. En la jurisdicción federal la regla ha sido interpretada en numerosas ocasiones. Se entiende que el propósito de la vista es recibir evidencia para dilucidar hechos en controversia. 7 *Moore's Federal Practice*, Sec. 65.04 [3], pág. 65–59, y casos citados allí.

En *Securities and Exch. Com'n* v. *Murphy*, 626 F.2d 633 (1980), el demandado alegó que el tribunal de instancia erró al conceder el *injunction* preliminar sin celebrar vista para

---

[2] "Para impedir la aplicación u observancia de cualquier ley de la Asamblea Legislativa de Puerto Rico, o el cumplimiento de cualquier actuación autorizada por ley de la Asamblea Legislativa de Puerto Rico, de un funcionario público, de una corporación pública, o de una agencia pública, o de cualquier empleado o funcionario de dicha corporación o agencia, a menos que se hubiera determinado por sentencia final, firme, inapelable e irrevisable que dicha ley o actuación autorizada por ley es inconstitucional o inválida.

. . . . . . .

"Disponiéndose sin embargo que; el tribunal podrá dictar dicha orden de entredicho provisional, *injunction* preliminar o permanente sujeto a los términos de la Regla 57 de Procedimiento Civil. . . ."

[3] "(a) *Notificación.* No se expedirá ningún auto de *injunction* preliminar sin notificación previa a la parte adversa.

"(b) *Consolidación de la vista con el juicio en sus méritos.* Antes o después de comenzada la vista para considerar una solicitud de *injunction* preliminar, el tribunal podrá ordenar que el juicio en sus méritos se consolide con dicha vista. Aun cuando no se ordene la consolidación, cualquier evidencia que sea admitida en la vista sobre la solicitud de *injunction* preliminar y que sea admisible en el juicio en sus méritos, pasará a formar parte del récord del caso y no tendrá que presentarse nuevamente el día del juicio."

recibir evidencia al resolver una moción de sentencia sumaria. El tribunal apelativo confirmó. Sostuvo que luego de examinar la totalidad de las circunstancias llegó a la conclusión de que la Securities and Exchange Commission había establecido con claridad la ausencia de controversias genuinas de hecho. Por ser el propósito de la vista escuchar a las partes y recibir evidencia sobre los hechos que estuvieren en controversia y por no existir tal controversia podía dictarse el *injunction* sin celebrarse la vista. Ver: *Sims* v. *Greene*, 161 F.2d 87 (1947); *Marshall Durbin Farms, Inc.* v. *National Farmers Org., Inc.*, 446 F.2d 353, 356 (1971); *Socialist Workers* v. *Ill. State Bd. of Elections*, 566 F.2d 586 (1977).

En el caso de *Corujo Collazo* v. *Viera Martínez*, 111 D.P.R. 552 (1981), sostuvimos que el procedimiento a seguir en los casos de *injunction* es el que dispone la Regla 57 de Procedimiento Civil y que las demás reglas aplican de modo supletorio, siempre y cuando no desvirtúen el carácter sumario del recurso.

En el caso de autos, el demandado presentó moción de desestimación. Alegó que como cuestión de derecho no procedía el *injunction* porque la Puerto Rico Telephone Co. no era una instrumentalidad pública. Entendió que debía desestimarse porque la demanda no exponía una reclamación que justificara la concesión de un remedio. Es evidente que el tribunal de instancia actuó conforme a la Regla 10.2 de Procedimiento Civil y consideró la moción de desestimación como una Sentencia Sumaria.[4] Las partes no se opusieron. La minuta de ese día revela que reunidos en

---

[4]". . . a opción de la parte que alega, las siguientes defensas pueden hacerse mediante moción debidamente fundamentada: . . . (5) dejar de exponer una reclamación que justifique la concesión de un remedio; (6) . . . Si en una moción en que se formulare la defensa número (5) se expusieren materias no contenidas en la alegación impugnada y éstas no fueren excluidas por el tribunal, la moción deberá ser considerada como una solicitud de sentencia sumaria y estará sujeta a todos los trámites ulteriores provistos en la Regla 36 hasta su resolución final y todas las partes deberán tener una oportunidad razonable de presentar toda materia pertinente a dicha moción bajo dicha regla."

cámara acordaron someter memorandos de derecho. La anotación hecha en el expediente en puño y letra de la juez expresa que el caso quedó sometido. El demandado en ningún momento cuestionó los hechos alegados en la demanda. Tuvo oportunidad de cuestionarlos en la vista en cámara y no lo hizo. Tuvo oportunidad de negarlos haciendo uso del término concedido por el tribunal de diez días después de ser notificado del memorando de derecho de la parte demandante para contestar la demanda y tampoco contestó. Presentó varios memorandos de derecho sobre si la Puerto Rico Telephone Company era o no una corporación pública. (5) Tuvo oportunidad de solicitar vista y no lo hizo. (6) Todas sus actuaciones reflejan que entendía que la controversia era de derecho y no de hechos. No puede alegar ahora que no se observó el debido proceso de ley.

El caso de autos es similar al de *Securities and Exch. Com'n* v. *Murphy*, supra. Procede dictar un *injunction* sin celebrar vista cuando, en ausencia de controversia de hechos, se resuelve mediante una moción de sentencia sumaria.

Pasamos a considerar la médula del recurso.

Después de la Primera Guerra Mundial surgió la necesidad de desarrollar corporaciones públicas para cumplir con las nuevas y numerosas tareas que confrontaban las naciones del mundo occidental. Mientras antes los gobiernos sólo se limitaban a reglamentar el funcionamiento y la operación de algunas industrias, se vieron obligados a llevar a cabo por sí mismos ciertas actividades económicas. (7) Por

---

(5) Mociones del 12 de febrero de 1979, 16 de febrero de 1979, 15 de octubre de 1979 y 11 de abril de 1980.

(6) En *Jacobson & Co., Inc.* v. *Armstrong Cork Co.*, 548 F.2d 438 (1977), se decidió que el demandado no puede quejarse de la falta de vista cuando tuvo oportunidad de solicitarla antes de expedirse el *injunction* para presentar evidencia y no la solicitó.

(7) D. E. Lilienthal, *The Conduct of Business Enterprises by the Federal Government*, 54 Harv. L. Rev. 545, 547 (1941). *The Public Corporation, A Compar-*

ejemplo, durante la guerra Estados Unidos se incautó de los ferrocarriles, el teléfono y el telégrafo y los administró. En época de escasez de capital, de altas tasas de contribución sobre las ganancias, de grandes riesgos para la inversión, se establecieron corporaciones públicas en los sectores de la economía donde el empresario se abstuvo de actuar. [8] El desarrollo de las mismas, en los distintos países, en muy pocos casos fue el producto de legislación sistemática y deliberada. En la mayoría de los casos una mezcla de factores políticos y prácticos fue el motivo determinante para su creación. [9] De la infinita variedad de corporaciones públicas se destacan principalmente tres tipos. [10]

1) Las agencias o departamentos de los gobiernos.

2) Las corporaciones públicas puras creadas por estatuto.

3) Las corporaciones de emisión de acciones organizadas al amparo de las leyes de corporaciones privadas que son controladas total o parcialmente por el gobierno. [11]

En Estados Unidos se ha incorporado bajo la Ley de Corporaciones de Delaware [12] una gran mayoría de las del último tipo. Tanto en Estados Unidos como en otros países, muchas de las que se organizaron bajo leyes de corporaciones privadas sufrieron profundas modificaciones.

Se han señalado varias ventajas para asumir la estructura de la corporación privada. Entre ellas se encuentran el evitar el formalismo y la reglamentación rígida para promover la eficiencia y la originalidad gerencial. [13]

---

*ative Symposium,* edited by W. Friedmann, Canada, Carswell Company, 1954, pág. 541.

[8] *The Public Corporation, A Comparative Symposium,* supra, pág. 542.

[9] Íd., pág. 545.

[10] Íd., pág. 547.

[11] J. Thurston, *Government Proprietary Corporations,* 21 Va. L. Rev. 351 (1935).

[12] Íd., pág. 364.

[13] Lilienthal, *supra,* pág. 563.

La estructura de corporación público-privada permite un funcionamiento independiente. No se ve obligada a esperar recibir asignaciones anuales de fondos para funcionar. Produce y genera su propio capital. Puede reinvertir el sobrante, ahorrar o reducir las tarifas de los consumidores, según convenga. De su estado financiero responderá a aquellos organismos dispuestos por ley, mediante informes periódicos preparados por auditores comerciales y los del propio gobierno. El hecho de que una corporación de esta naturaleza no funcione con el objetivo de hacer ganancias, sino de generar beneficio social, no justifica que su gerencia manifieste menor preocupación por el éxito de su administración. Al contrario, por razón de su *status* especial tiene una obligación mayor de examinar sus costos y rendir cuentas de sus operaciones. (14) En cuanto a su política de personal, se ha considerado un axioma que la eficiencia de una empresa comercial requiere que la selección, ascensos, retención de empleados se den respondiendo a un sistema puramente de mérito. (15) En los departamentos y agencias de gobierno por lo general el reclutamiento y tenencia de empleo se basa en las cualificaciones políticas de los candidatos. Este tipo de corporación que estamos considerando posee suficiente independencia para poder ignorar factores políticos y desarrollar sus propias soluciones a los problemas de compensación, horario de trabajo, incentivos, tenencia y relaciones laborales. La calidad de las relaciones entre la gerencia y los empleados puede convertirse en el mayor activo de la corporación. El personal de estas corporaciones debe estar lleno del ideal de servicio público, aunque no necesariamente formen parte del sistema de personal central. Hasta qué punto los empleados de estas corporaciones deben ser o no ser parte de ese sistema, es una materia que está fuertemente influida por las tradiciones, por el deseo

---

(14) Lilienthal, *supra*, pág. 565; *The Public Corporation*, supra, pág. 590.

(15) *The Public Corporation*, supra, pág. 590.

de seguridad y por otras consideraciones que varían de país a país.(16)

El problema más importante que confronta cada país es alcanzar el equilibrio adecuado entre la autonomía gerencial de estas corporaciones y la responsabilidad política de ofrecerle la dirección pública adecuada. A pesar de que se aproximan al *status* de personas legales privadas, esta característica no puede tener supremacía sobre las responsabilidades públicas que su organización conlleva. La combinación de ser reglamentada bajo la ley pública, de un lado, y bajo la ley privada, de otra parte, es un asunto todavía difícil de aceptar cuando se trata de analizar los problemas jurídicos, pero es esencial ante las circunstancias socio-históricas presentes.(17)

█ El recurrente alega que la Puerto Rico Telephone Co. es una corporación privada porque fue incorporada y mantiene su *status* de corporación privada bajo la Ley de Corporaciones de Delaware. Cumple con los requisitos que se le exigen a las corporaciones privadas. Como vimos, esto no constituye fundamento para negar su condición de corporación público-privada. A pesar de estar incorporada como corporación privada bajo la Ley de Delaware, la Autoridad de Teléfonos, corporación pública del Estado Libre Asociado, es dueña del 100% de sus acciones. Existe un desdoblamiento de personalidad público-privada con el fin de lograr rendir un mejor servicio público y lograr unos propósitos. La Ley Núm. 25 del 6 de mayo de 1974 (27 L.P.R.A. sec. 405)(18) facultó a la Autoridad de Teléfo-

---

(16) *The Public Corporation*, supra, a las págs. 563–565.

(17) Id., págs. 591–593.

(18) "Por la presente se faculta a la Autoridad para adquirir el Sistema o todas las acciones comunes emitidas por la Puerto Rico Telephone Company (la Compañía) que estén en circulación, por el precio y bajo los términos y condiciones que la Autoridad estime sean en bien de los mejores intereses del Estado Libre Asociado de Puerto Rico, disponiéndose que tanto la Autoridad como la Compañía y sus compañías matrices, podrán negociar esta transacción libremente y sin la intervención de terceros, incluyendo a la Comisión de Servicio Público. En relación con

nos, corporación pública creada por esa misma ley, 27 L.P.R.A. sec. 402, para adquirir el sistema o todas las acciones comunes emitidas por la Puerto Rico Telephone Co. Dispuso que todos los miembros de la Junta de Gobierno de la Autoridad de Teléfonos compondrían la Junta de Directores de la Puerto Rico Telephone Co. y que el Director Ejecutivo de la Autoridad ocuparía el cargo de Presidente de la Compañía. Le confirió a la Autoridad el poder discrecional para continuar operando el sistema de teléfonos a través de la Compañía o de disolverla. El Art. 3 (27 L.P.R.A. sec. 403 (a) y (b)[19] declaró que el propósito de la ley era mejorar y expandir las facilidades de comunicaciones para rendir al público servicios adicionales y más eficientes. El Art. 11 de la Ley le exime de pagar contribuciones o arbitrios, exención típica de las instrumentalidades gubernamentales.

---

la adquisición del Sistema, la Autoridad podrá, a su discreción, asumir el pago del principal e interés de cualesquiera o de todos los bonos de la Compañía y asumir cualesquiera o todas las deudas y obligaciones de la Compañía, y proveer para la cesión a la Autoridad, o persona o entidad designada por ésta, de cualesquiera o todos los contratos en existencia y derechos e intereses intangibles de la Compañía. En el caso que la Autoridad adquiera todas las acciones comunes de dicha Compañía, todos los miembros de la Junta de Gobierno compondrán la Junta de Directores de la Compañía, disponiéndose, además, que el Director Ejecutivo de la Autoridad ocupará el cargo de Presidente de la Puerto Rico Telephone Company. La Autoridad podrá, a su discreción, continuar operando el Sistema a través de la Compañía, o disolver la Compañía o hacer que todo o parte del activo, derechos e intereses de la Compañía sean cedidos o de otro modo traspasados a la Autoridad o a cualquier corporación subsidiaria de la Autoridad, o de otro modo, ejercer todos los derechos y poderes conferidos por ley a los accionistas de la Compañía. Nada de lo expresado aquí se considerará como una limitación o prohibición al derecho de la Autoridad de adquirir el Sistema o cualquier parte del mismo mediante el ejercicio del derecho de expropiación."

[19] "Por la presente se resuelve y se declara que:

"(a) un sistema eficiente de comunicaciones es esencial para las operaciones del Gobierno del Estado Libre Asociado de Puerto Rico y para proseguir con el desarrollo económico de Puerto Rico en beneficio y para el bienestar general de los habitantes de Puerto Rico;

"(b) a fin de mejorar y expandir las facilidades de comunicaciones en Puerto Rico, con el propósito de rendirle al público servicios adicionales y más eficientes. . . ."

■ Finalmente alega el recurrente que la Puerto Rico Telephone no es una corporación pública por el hecho de que el Art. 9 (27 L.P.R.A. sec. 409)[20] dispone que "nada en este Capítulo se interpretará como que se le concede a la Puerto Rico Telephone Company o a cualquier compañía cuyo capital sea adquirido por la Autoridad, la condición de una corporación pública del Estado Libre Asociado de Puerto Rico". El Informe Conjunto de las Comisiones de Gobierno, Hacienda, Desarrollo Socioeconómico y Planificación, Comercio e Industria, Asuntos del Consumidor y Jurídico-Civil previa consideración del P. del S. 737, de 15 de marzo de 1974, que se convirtió en la Ley Núm. 25 de 6 de mayo de 1974, expresa a la pág. 39, que la adquisición de las acciones comunes de la Puerto Rico Telephone Co. se contempla "como"[21] una corporación privada subsidiaria

---

[20] "Por la presente la Autoridad queda facultada para crear por resolución aquellas corporaciones subsidiarias que estime conveniente para llevar a cabo los fines de este Capítulo y para prestar o donar fondos y transferir cualesquiera de sus propiedades a tales corporaciones subsidiarias. Dichas corporaciones subsidiarias serán corporaciones públicas poseídas enteramente por la Autoridad y tendrán las facultades y deberes conferidos a la Autoridad bajo las disposiciones de este Capítulo que le sean asignados a ellas por la Junta de Gobierno; Disponiéndose, sin embargo, que nada en este Capítulo se interpretará como que se le concede a la Puerto Rico Telephone Company o a cualquier compañía cuyo capital sea adquirido por la Autoridad, la condición de una corporación pública del Estado Libre Asociado de Puerto Rico. La Junta de Gobierno nombrará a los miembros de la Junta de Directores de cualesquiera de tales corporaciones subsidiarias, disponiéndose, que por lo menos una mayoría de los miembros de la Junta de Directores de las mismas estará compuesta por miembros de la Junta de Gobierno. Todos los derechos, privilegios, inmunidades y exenciones concedidas a la Autoridad bajo este Capítulo quedan por la presente concedidas [a] tales subsidiarias en el desempeño de las facultades y deberes asignados a ellas por la Junta de Gobierno."

[21] La Opinión del Secretario de Justicia, Núm. 4 de 1975 concluyó que la "Telefónica" no tenía que ser registrada en el Departamento de Estado como se le requiere a una corporación privada, ya que para los fines de su creación y funcionamiento dicha corporación se constituyó "como una corporación pública" con todos los poderes de la Ley Núm. 25 del 6 de mayo de 1974. En la Decisión y Orden del 20 de febrero de 1975 de la Junta Nacional del Trabajo de la Región 24 del Caso no. 24-RG-5524, *Puerto Rico Telephone Company and Unión de Tronquistas de Puerto Rico, Local 901, etc.*, se desestimó la solicitud de traslado del caso a la jurisdicción federal porque se entendió que la adquisición de la Puerto Rico Tele-

de la Autoridad. Esta preservación del *status* de compañía privada serviría para asegurar la tributabilidad de los intereses que se paguen sobre $120 millones en obligaciones vigentes (*debentures*). Una vez vencida o retirada la deuda de la Telefónica la Autoridad podría disolverla. En adición permitiría flexibilidad en la planificación y estructuración de la Telefónica. Asimismo lo manifiesta el informe sometido al Honorable Gobernador de Puerto Rico por la Comisión sobre la Adquisición de la Puerto Rico Telephone Company, con fecha del 6 de febrero de 1974, en la Sec. 8, pág. 1.

El 26 de abril de 1974 se discutió el proyecto de ley que se convirtió en la Ley Núm. 25, *supra*. El Acta de la Cámara de Representantes de esa fecha refleja que el Representante Del Valle Escobar, quien presentó el proyecto, manifestó que la Puerto Rico Telephone Company continuará operando como una corporación privada, subsidiaria de la Autoridad porque "esta preservación de 'status' serviría para asegurar la tributabilidad de los intereses que se paguen sobre ciento veinte millones en obligaciones vigentes". Por otro lado, el Representante Jarabo comentó el Art. 3 de la Ley y señaló que inciso *a* establecía que el sistema eficiente de comunicaciones era una prioridad y el inciso *b* establecía que el sistema de comunicación sería propiedad pública.

Se contempló que en un período de cinco años podía integrarse totalmente en uno el sistema de comunicación telefónica de Puerto Rico, bajo la supervisión de la Junta de Gobierno de la Autoridad de Teléfonos, que a su vez sería la Junta de Directores de la Puerto Rico Telephone Company. La intención del legislador es clara. Adquirió la Puerto Rico Telephone Company para que fuera parte del sistema de corporaciones públicas que rendiría el servicio telefónico y que funcionaría como el tipo de corporación pública que se organiza bajo las leyes de corporaciones privadas para que

---

phone Company convirtió a ésta en una subdivisión política del Estado y por lo tanto no tenían jurisdicción para ver el caso.

funcione como una corporación privada por las razones antes expuestas. Por consecuencia, para ciertos asuntos o negocios jurídicos, de acuerdo al caso en particular se le considerará como corporación pública o corporación privada.

 La Ley Núm. 5 de 14 de octubre de 1975 (3 L.P.R.A. sec. 1301 *et seq.*), Ley de Personal del Servicio Público, en su Sec. 2.1 (3 L.P.R.A. sec. 1311(2))([22]) dispone que todos los empleados públicos, sean éstos empleados estatales, municipales o de otras agencias estarán cubiertos por un solo sistema de personal, establecido para hacer cumplir el principio de mérito, el cual se conocerá como Sistema de Personal del Servicio Público. La Sec. 10.6 (3 L.P.R.A. sec. 1338(3) y (4))([23]) establece que las disposiciones de este Capítulo no aplicarán a los empleados de agencias o instrumentalidades que funcionen como empresas o negocios privados ni a los empleados de agencias o instrumentalidades que tengan derecho a negociar colectivamente mediante leyes especiales. Añade que estos grupos deberán adoptar, con el asesoramiento de la Oficina de Personal y dentro de los próximos 120 días de la aprobación de la Ley, un reglamento de personal en que se incorpore el principio de mérito que regirá las normas de personal de aquellos

---

([22]) "A fin de asegurar la extensión y el fortalecimiento del principio de mérito a todos los sectores del servicio público puertorriqueño, todos los empleados públicos, sean éstos empleados estatales, o municipales a excepción de los excluidos en la sec. 1338 de este título, estarán cubiertos por un solo sistema de personal, establecido para hacer cumplir el principio de mérito, el cual se conocerá como Sistema de Personal del Servicio Público."

([23]) "(3) Los empleados de agencias o instrumentalidades del Gobierno que funcionen como empresas o negociados privados

"(4) Los empleados de agencias o instrumentalidades del Gobierno que tengan derecho a negociar colectivamente mediante leyes especiales y

. . . . . . . .

"Las agencias o instrumentalidades aquí excluidas bajo los incisos (3) y (4) deberán adoptar, con el asesoramiento de la Oficina de Personal, y dentro de los próximos 120 días de la aprobación de esta ley, un reglamento de personal incorporando el principio de mérito que regirá las normas de personal de aquellos empleados no cubiertos por convenios colectivos. Copia de los reglamentos así adoptados serán enviados a la Asamblea Legislativa de Puerto Rico."

empleados no cubiertos por convenios colectivos. En la Carta Normativa Núm. 1-80 del 9 de julio de 1980 dirigida a los distintos Jefes de Departamentos y Agencias, el Director de la Oficina Central de Administración de Personal informó que la Autoridad de Teléfonos de Puerto Rico estaba excluida de las disposiciones de la Ley de Personal y conforme a la Ley debería adoptar un reglamento de personal que incorporara el principio de mérito que regiría las normas de personal de aquellos empleados no cubiertos por convenios colectivos. La Autoridad de los Puertos fue clasificada en esta misma categoría. En *Reyes Coreano* v. *Director Ejecutivo*, 110 D.P.R. 40 (1980), resolvimos que el principio de mérito era aplicable a la Autoridad de los Puertos. Es obvio que por las mismas razones el principio de mérito también le es aplicable a la Autoridad de Teléfonos y su subsidiaria, la Puerto Rico Telephone Co., no obstante su organización como corporación privada. El análisis hecho en *Reyes Coreano*, supra, a la luz de los principios de política pública de la Ley, subsiste. La Ley revela la clara intención de extender los beneficios de una administración de personal basada en el principio de mérito al mayor número posible de empleados del sector público. Le impuso la obligación de administrar su personal no unionado de conformidad con el principio de mérito, aun cuando en atención a sus particulares circunstancias quedaran efectivamente excluidas de las restantes disposiciones de la Ley. Cuando anteriormente discutimos las ventajas de las corporaciones público-privadas, vimos que la política pública que se concretiza en esta ley es una de las ventajas o activos que posee este tipo de corporación. Así se ha implementado en varios países. Propicia el mejor y más eficiente servicio.

En *Delgado Rivera* v. *Alcalde de Carolina*, 109 D.P.R. 5 (1979) y en *Delbrey* v. *Municipio de Carolina*, 111 D.P.R. 492 (1981), resolvimos que si los reglamentos de los municipios no cumplen con el propósito primordial de garantizar la aplicación estricta del principio de mérito para la sepa-

ración de servicio, entonces se observará lo provisto por la Ley y el Reglamento de Personal.

 ■ Examinemos, pues, si el Reglamento de la Puerto Rico Telephone Co. garantiza los derechos concedidos por el principio de mérito de la Ley de Personal. La carta de despido que consta en autos dirigida a la demandante con fecha 9 de octubre de 1978, justifica el despido a base de aplicarle la Regla Núm. 41 de Reglamento de Disciplina (Actos Amenazantes), que conlleva el despido inmediato sin vista. Por lo tanto, ese mismo día quedó cesante sin celebración de vista. La Sec. 4.6 de la Ley Núm. 5 de 14 de octubre de 1975 (3 L.P.R.A. sec. 1336(4))[24] dispone que las autoridades nominadoras podrán destituir a cualquier empleado de carrera por justa causa y previa formulación de cargos, por escrito y previa vista administrativa si así lo solicitare el empleado.[25] Al despedir a la demandante, la Puerto Rico Telephone no cumplió con el principio básico del sistema de mérito: una vista previa al despido. La Regla 41 del Reglamento de la Puerto Rico Telephone Co. no es válida.[26]

Por las razones antes expuestas *procede dejar sin efecto el despido del empleo de la recurrida y se ordena la celebración de una vista según lo requiere la Ley.*

El Juez Presidente Señor Trías Monge y el Juez Asociado Señor Díaz Cruz no intervinieron.

---

[24] "Las autoridades nominadoras podrán destituir a cualquier empleado de carrera por justa causa y previa formulación de cargos, por escrito y previa vista administrativa, si así lo solicitare el empleado."

[25] La Ley Núm. 1 de 17 de julio de 1979 (3 L.P.R.A. sec. 1336(4) Suplemento) enmendó la anterior para suprimir "y previa vista administrativa, si así lo solicitare el empleado". Como el despido en el caso de autos ocurrió en 1978, se aplica la ley vigente al momento del despido.

[26] En *Bishop* v. *Wood*, 426 U.S. 341 (1976), un empleado de carrera fue despedido sin vista. Se le hicieron imputaciones de conducta no adecuada para servir en el cuerpo de la Uniformada. El estatuto de personal permitía que se despidiera a los empleados de carrera a gusto y voluntad de la ciudad. Se decidió que la Ley en sí no le aseguraba un derecho de propiedad y el conocimiento de la misma Ley impedía que se hubiere forjado una expectativa de continuidad en su empleo. Por lo tanto, no se le violó el derecho al debido proceso de ley y el despido sumario fue válido.