Amador D'ALZINA, Plaintiff,

v.

Miguel D. LAUSELL, et al.,
Defendants.

Civ. No. 86–0238(RLA).

United States District Court,
D. Puerto Rico.

Sept. 16, 1988.

Jorge A. Pierluisi, Jr., Hato Rey, P.R., for plaintiff.

Pedro J. Salicrup, Fiddler Gonzalez & Rodriguez, San Juan, P.R., Zuleika Llovet, Saldaña Rey Moran & Alvarado, Santurce, P.R., for defendants.

OPINION AND ORDER

ACOSTA, District Judge.

Amador D'Alzina has sued the Puerto Rico Telephone Company (alternatively "the Company" or "PRTC") and five of its officers complaining that they violated his civil rights by discharging him from his high-ranking managerial position solely because of his affiliation to the New Progressive Party. In his complaint, based on 42 U.S.C. § 1983, plaintiff claims that defend-

**378**

ants, under color of state law, denied him his first amendment right to freedom of association by firing him for political reasons and his fourteenth amendment right to due process of law by not giving him a pre-dismissal hearing. He seeks injunctive relief and compensatory damages for this alleged constitutional tort.

We will now rule upon a rash of dispositive motions filed by both sides.

## BACKGROUND

In the present case, three motions for summary judgment were filed on the same day. They were followed by a long string of oppositions, replies, and surreplies.

Starting the hit parade was plaintiff who filed a motion for partial summary judgment (filed April 30, 1987, docket No. 38) arguing that under the personnel regulations of the Company (Article 10.2 promulgated on April 4, 1983) he had a property-interest which, pursuant to established constitutional law, could not be taken without notice and a pre-termination hearing. *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed. 2d 494 (1985). It being uncontroverted that plaintiff received no hearing before his termination, he concludes that there is no triable issue that he was denied due process of law. Two distinct groups of defendants, one the Company and the other the defendant-officers of the Company, separately opposed plaintiff's motion but on essentially the same ground, i.e., that plaintiff, having been hired and/or transferred illegally to his position, did not have a property interest and therefore received all the process due to him. (*See* dockets Nos. 46 and 51).

Prior to their oppositions, in fact concurrent with plaintiff's motion, the two groups of defendants filed their own summary judgment motions seeking mainly to dismiss the entire complaint. Both motions cover the same panoply of defenses, to wit, and in a rehash of their oppositions, that D'Alzina was illegally hired; that D'Alzina performed confidential, policy-making and/or spokesperson duties; and, lastly,

that in 1985, when D'Alzina was dismissed, it was not clearly illegal to fire professionals like him and therefore defendants should be granted immunity from having to pay damages in this suit. Plaintiff dutifully opposed these motions (*see* docket No. 50, filed July 14, 1987). As to the foundation for his alleged property interest, he avers that "/h/is status as a regular managerial employee was legitimate and valid pursuant to personnel practices and norms implemented during those years /i.e., 1979–1985/." (Plaintiff's Memorandum at 3.) In other words, that he had expectation of continued employment, based on company policies, which gelled into a constitutionally protected property interest pursuant to the judicial doctrine established in *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

Plaintiff also disputes that his hiring was in any way improper especially given that the Puerto Rico Public Service Personnel Act, 3 L.P.R.A. §§ 1301 *et seq.* (1978), was not expressly made applicable to the PRTC until the Puerto Rico Supreme Court case of *Torres–Ponce v. Jiménez,* 113 D.P.R. 58 (1982). (It was this case in fact that prompted the Company to promulgate new personnel regulations, in 1983, to incorporate the merit principle underpinning the Personnel Law.) Plaintiff asserts rather simply that he was hired in 1979, and that that hiring process, though now prohibited by all applicable law, was nonetheless at the time a proper one. Moreover, he asserts that his transfer in September 1985 from Executive Aide to the PRTC Board President (as well as Secretary of the Board) to Commercial Director Metro/North/West Area was also legal under the law and regulations.

Finally, plaintiff strongly opposes defendants' averments that he was a confidential employee properly subject to political dismissal.[1] On this count he states: "There is no question whatsoever that plaintiff was and performed primarily as an Executive Assistant. The delegated duties performed as Secretary of the Board

---

**1.** He seems to ignore, however, defendants' claim of qualified immunity.

were of a secondary nature." (Plaintiff's Memorandum at 3.)

Subsequent to the filing of the three main motions for brief disposition and their corresponding oppositions, the Court was flooded by derivative motions such as replies, surreplies, motions for judicial notice, oppositions thereto, etc. The Court has studied them all. None requires extended comment as each one generally tends to restate arguments already submitted to the Court.[2]

### ISSUES

The main issue before us is whether or not plaintiff had a property interest in his former position such that he was entitled to a pre-termination hearing as prescribed by *Loudermill, supra.*

The other important issue is whether or not plaintiff's former job, considering its inherent duties and its link to the political concerns of the Company, was such that political affiliation was an appropriate job requirement. And, if not, whether political affiliation was a substantial or motivating factor in plaintiff's dismissal.

Since we find that recent case law from the First Circuit Court of Appeals supports defendants' arguments and compels us to dismiss the complaint we will not consider defendants' entitlement to qualified immunity.

### SUMMARY

We will dismiss plaintiff's complaint for the following reasons: (1) D'Alzina has no viable due process claim because he was illegally hired to his first job with PRTC. He thus has no property interest in continued employment with the Company; (2) plaintiff's due process claim also fails because his first job with the Company, i.e., Executive Assistant and Secretary to the Board was imbued with confidential/policy-making/spokesperson duties which clearly affected the politically sensitive affairs of the entire organization such that plaintiff was dischargeable at will; (3) although plaintiff characterizes his second, and last, job with the Company as a "career" one and thus constitutionally protected—that transfer, five months before his dismissal, was as illegal as his first hiring and similarly fails to provide plaintiff with any property interest. In short, plaintiff's hiring and transfer were illegal and, in addition, his first job was highly confidential, therefore, plaintiff cannot claim any fourteenth amendment constitutional protection.

Regarding plaintiff's first amendment claims, the confidentiality of both the positions he occupied and their influence on the politically colored tasks of the company preclude any Section 1983 claim. Specifically, to continue the above list: (4) to the extent we can (barely) assume that plaintiff legitimately occupied a "career" position, we find from a careful study of the inherent duties of that position that it is truly one of confidence requiring PDP affiliation thus making plaintiff, again, freely dischargeable; and (5) even if it can be considered that the position of Commercial Director Metro/North/West does not require political affiliation,[3] we nonetheless find

---

2. The motions, in abbreviated form, are the following: (1) Defendants' Reply to Plaintiff's Opposition (docket No. 51, filed 7/22/87); (2) Plaintiff's Reply to Defendants' Reply (docket No. 53, filed 8/12/87); (3) Codefendant PRTC's Reply to Plaintiff's Opposition (docket No. 54, filed 8/17/87); (4) Defendants' Reply to Plaintiff's Reply to Defendants' Reply (docket No. 58, filed 9/17/87); (5) Plaintiff's Supplemental Reply to Defendants' Motion for Summary Judgment (no docket number assigned, filed 10/5/87); (6) Codefendant PRTC's Motion for Judicial Notice of *Kaufman* (1st Cir.) (docket No. 61, filed 2/19/88); (7) Defendants' Motion for Ruling on Summary Judgment (docket No. 62, filed 2/24/88); (8) Plaintiff's Opposition to Defendants' Motion for Judicial Notice of *Kauf-*

*man* (docket No. 63, filed 4/4/88); (9) Plaintiff's Motion for Judicial Notice of *Alvarado–Cordero v. Darío Hernández* (1st Cir.) (docket No. 64, filed 4/11/88); and (10) Defendants' Request for Judicial Notice of *Ramón Ruiz Roche v. P.R.T.C.* (1st Cir.) and for Ruling on Motion for Summary Judgment (docket No. 66, filed 6/15/88).

3. This assumption is somewhat tenuous because we find that the Commercial Director position is even more subject to partisan political differences than the position of First Deputy Commissioner of the Department of Water of the City of Chicago discussed in *Tomczak v. City of Chicago*, 765 F.2d 633 (7th Cir.1985) (the distribution of the water supply is of vital concern to the

under this last alternative that plaintiff did not meet his burden pursuant to *Celotex, infra,* that political affiliation was a substantial or motivating factor behind plaintiff's dismissal.

## STANDARD OF REVIEW

Although plaintiff filed a motion for summary judgment regarding his due process claim, we will consider him as the non-movant for purposes of this opinion and we view the record in the light most favorable to him. To defeat a summary judgment motion the non-moving party must demonstrate the existence of a genuine issue of material fact pertaining to those factual issues in which it would bear the burden of proof at trial. *See Celotex v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Kaufman v. Puerto Rico Telephone Company,* 841 F.2d 1169, 1172 (1st Cir.1988). "Thus, summary judgment is proper when, after adequate time for discovery, the party against whom judgment is sought fails to show sufficient basis for the establishment of an essential element of its case." (Citations omitted). *Kaufman, supra.*

The Supreme Court in three consecutive decisions[4] has spearheaded a current renascence in summary judgment thereby increasing the burden on a challenged party to prove its case before trial. The moving party at bottom must simply demonstrate an absence of evidence to support the non-movant's case, prompting the non-movant

to establish its case with sufficient evidence or otherwise lose its cause.

For the reasons below, we find that plaintiff has failed to show the existence of a triable issue of fact. Moreover, we find that no further exploration of the facts (beyond the record) is really necessary, *see Johnson v. Educational Testing Service,* 754 F.2d 20, 25 (1st Cir.1985) (citing *Packish v. McMurtrie,* 697 F.2d 23, 27 (1st Cir.1983)), since the record as a whole makes it apparent that under no set of conceivable facts could plaintiff, given the politically influential nature of his position(s), prove that he enjoyed constitutional protection against a politically motivated dismissal.[5] In this sense, summary judgment must be granted as there can be but one reasonable conclusion that plaintiff will not prevail at trial. *Anderson,* 477 U.S. at 247, 106 S.Ct. at 2509.

## DISCUSSION

Before we begin our analysis of plaintiff's due process and freedom of association claims, it is important to understand that in this case, unlike the typical political discrimination case, plaintiff was fired five short months after he was transferred from another, very different, position in the Company. And plaintiff is not challenging that transfer, indeed he requested it, but only his ultimate dismissal. Therefore, we will be focusing on two positions rather than one and on the effects not only of an illegal hiring but of an illegal transfer as well.[6]

electorate and may fuel principled disagreements as to the implementation of program goals).

4. *See Celotex, supra; Anderson v. Liberty Lobby,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (involving products liability, libel and antitrust claims wherein the Supreme Court reversed the respective Court of Appeals' reversals of their district courts' grants of summary judgment).

5. As we explain below, even if plaintiff could prove he was so protected, he has failed to show that his political affiliation was the substantial or motivating factor for his dismissal. Summary judgment is proper because plaintiff, as the lengthy record indicates, was on notice that he

had to come forward with all his evidence. *Celotex,* 477 U.S. at 326, 106 S.Ct. at 2554. *Cf. Donate–Romero v. Colorado,* 856 F.2d 384 (1st Cir.1988) (Reversal of summary dismissal of patronage complaint because slim record revealed lack of adequate notice.)

6. We conclude in the main that as to the due process of law claims, D'Alzina was owed none either because he was illegally hired *and* illegally transferred or because *both* positions he occupied were of such a confidential nature, regardless of what label the parties or even the legislature give them, *see Goyco de Maldonado v. José A. Rivera,* 849 F.2d 683, 688 (1st Cir.1988) (regulations of defendant, decisions of the Puerto Rico Courts or job classification labels enacted by the legislature have been consistently treated by the First Circuit as nondispositive), that

Although we listed several, at times alternative, reasons for dismissing the complaint,[7] we feel clarity will be best served if we expound on those reasons under the two distinct constitutional claims made by plaintiff, i.e., due process and first amendment.

### 1. *Due Process Claim*

"It is well-established that the Due Process Clause of the Fourteenth Amendment guarantees public employees who have a property interest in continued employment the right to at least an informal hearing before they are discharged." *Kaufman v. Puerto Rico Telephone Company*, 841 F.2d 1169, 1173 (1st Cir.,1988) (citing *Cleveland Board of Education v. Loudermill*, 470 U.S. at 538, 105 S.Ct. at 1491; *Board of Regents v. Roth*, 408 U.S. at 576–78, 92 S.Ct. at 2708–09; *Kercado–Meléndez v. Aponte–Roque*, 829 F.2d 255, 262 (1st Cir. 1987)).

The right to a pre-termination hearing applies only to public employees who possess a property interest. To determine if a property interest exists we have to look not to the Constitution but to the "existing rules or understandings that stem from an independent source such as state law." *Loudermill*, 470 U.S. at 539, 105 S.Ct. at 1492 (quotations and citations omitted). Although state law governs the creation of the property interest, the question of the process due is a matter of federal law. *Id.* at 541, 105 S.Ct. at 1492–1493.

In short, the threshold question is whether or not a property interest has been created and, if so, how much process is due considering the type of interest involved. We need not reach the second leg of the analysis since the record clearly shows that plaintiff does not have a property interest at stake here requiring any more process than was afforded to him.

In his motion for partial summary judgment and repeatedly throughout subsequent motions, plaintiff insists that the personnel norms and/or practices existing at PRTC at the time of his recruitment gave plaintiff an "unquestionable" expectation of continued employment. Further, that the 1983 Personnel Regulations of the Company, especially Section 10.2, "recognized the permanent status of regular managerial employees hired after October 14, 1975." (Plaintiff's Memorandum of Law at 4). And, lastly, that "/t/he Supreme Court of Puerto Rico expressly held in *Torres–Ponce v. Puerto Rico Telephone Company*, 113 D.P.R. 58, 71 (1982) that regular managerial employees of the PRTC had a right to a prior preferement of charges and a hearing before their dismissal." *Id.* at 5.

It would appear at first glance, considering the Company's regulations, that at least the "officially sanctioned rules of the work place" would provide plaintiff with his attested property right, *see Perry v. Sindermann*, 408 U.S. 593, 601–02, 92 S.Ct. 2694, 2699–2700, 33 L.Ed.2d 570 (1972). But the First Circuit has recently held, in a similar context, that those agency rules can be a legitimate source of a property right *only* when they are compatible with the merit principle underlying the Puerto Rico Civil Service Statute, 3 L.P.R. A. § 1338(4), (5) (1978). *Ruiz–Roche v. Miguel D. Lausell*, 848 F.2d 5, 7 (1st Cir. 1988).

In other words, "under Puerto Rico law any property right associated with a career position is rendered null and void if a violation of the Personnel Act attends the filling of such a position." *Kaufman*, at 1173. This, as the First Circuit recognized, is the holding of *Torres–Ponce, supra.*

In *Ruiz–Roche, supra*, the plaintiff-appellant, like plaintiff herein, was an Executive Assistant (as well as legal counsel) to the PRTC and he was also hired prior to the 1983 PRTC personnel regulations, i.e., in 1981. There, the First Circuit, presented with mirror arguments to the ones before us (in fact, Ruiz–Roche was represented by

---

plaintiff was dischargeable at will. In that vein, political affiliation was "an appropriate requirement for the effective performance of the public office involved." *Branti v. Finkel*, 445 U.S. 507, 518, 100 S.Ct. 1287, 1295, 63 L.Ed.2d 574 (1980).

7. *See, supra*, pages 379–80.

the same counsel as our plaintiff, albeit this attorney, Mr. Pérez Hernández, has just last month withdrawn his representation in this case), affirmed the district court's dismissal of plaintiff's Section 1983 due process claims (there was no First Amendment issue on appeal) on the basis that plaintiff had no property right to his job at PRTC because he was originally hired to that position in a manner that violated the "merit principle" underlying the civil service statute or personnel law. 3 L.P.R.A. § 1338(4), (5) (1978) *Id.* at 6.

The inconsistency with the merit principle was simply that PRTC had initially classified Ruiz–Roche as a "regular managerial employee" dischargeable only for just cause whereas the merit principle permitted only two classifications: (1) career employee (entitled to a pre-termination hearing); and (2) confidence employee (dischargeable at will). The Court held that Ruiz Roche's duties prior to *Torres Ponce* were of a confidential character making him freely dischargeable. *Id.* at 7. This status, the First Circuit further held, did not change with PRTC's new regulations, *Id.* at 8, and thus he had no cognizable interest in continued employment. The Court rejected off-hand the argument, also presented here, that Sections 8.10(7), 10.2, and 14.15 of the new regulations imbued plaintiff with some sort of "permanent status" or that Article 5 of the same regulations entitled him to reinstatement at a career-level position. *Id.* (The Court noted as well that a federal court has no jurisdiction to order reinstatement as a remedy for a purely state law violation. *Id.* at 8 n. 3, citing *Pennhurst State Hospital v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed. 2d 67 (1984)).

Plaintiff has remained conspicuously and uncharacteristically quiet since defendants asked us to take judicial notice of the *Ruiz–Roche* case (and to rule on their motions for summary judgment accordingly). We can understand plaintiff's reticence because *Ruiz–Roche* levels his arguments like a child would a house of cards.

■ Rather than "reinvent the wheel," we refer the reader to the succint discussion found both in *Kaufman* and *Ruiz–Roche* regarding an illegally hired PRTC employee's lack of a property interest in his former employment. Suffice it to say that regardless of D'Alzina's classification as a confidence or career employee he had no property interest in continued employment because he was illegally hired to his first position with PRTC and later he was illegally transferred. Therefore, his due process claim must be dismissed.

Admittedly, neither *Kaufman* nor *Ruiz–Roche* dealt with illegal *transfers* (as opposed to illegal hirings) but we find that the *ratio decidendi* of those decisions clearly apply to a situation such as this one where the merit principle is completely undermined insofar as the transfer was effected without any public notice or competition whatsoever. (Apparently D'Alzina did not even meet the years of experience and educational requirements of the job.) In addition, at least one if not more of the internal employees, who were qualified for the position of Commercial Director of the Metropolitan Area, lodged formal complaints about D'Alzina's transfer. (*See* Defendants/Officers' Memorandum of Law, docket No. 39, pp. 5–10 for references to the supporting documentation.)

It is uncontroverted that plaintiff was transferred in a way that effectively gutted the whole purpose of the merit system of public employment. That purpose is essentially to attract the most qualified public employees—especially those who meritoriously come up the ranks and openly match their abilities with other applicants. *Torres–Ponce* made it clear that this was the only way to promote a public administration governed by "uniformity, equity, and justice." 3 L.P.R.A. § 1312.

Although, as plaintiff argues, the companies' regulations do not *specifically* require public notice and open competition as to *transfers,* we can only reiterate what we stated above at pp. 379–80, that the regulations of the Company are not dispositive. The timing and method of the transfer seem highly irregular. And certainly it is clear to us that the transfer mechanism cannot be used to circumvent the very mer-

it principle that has repeatedly concerned the First Circuit and the Puerto Rico Supreme Court. Their most recent pronouncements tell us that public personnel actions in general, which we read as including transfers to completely new and different positions, must strictly comply with the maxim that public office must be based on worthiness. We, therefore, find that the Company was not free to transfer plaintiff to such high office without first considering other, possibly more meritorious employees, within the company. After all, whether or not Mr. D'Alzina was in fact the right employee for the job could be best ascertained by considering him in the pool of all interested applicants.

Although we are certain that the violations of the merit principle inherent in plaintiff's hiring and transfer preclude his due process claim, our holding does not rest on this conclusion alone. As the analysis below will reveal, *both* of plaintiff's positions required a political affinity plaintiff did not have and because in this sense he was a confidential employee he could be legally discharged without any hearing whatsoever.

Accordingly, plaintiff cannot proceed with his due process claims and the same shall be dismissed.

### 2. *First Amendment*

The Supreme Court has held that even though an individual lacks a property interest in continued employment, this is "not sufficient to justify a dismissal based solely on an employee's private political beliefs." *Branti*, 445 U.S. at 512 n. 6, 100 S.Ct. at 1291 n. 6.[8]

Therefore, we need to consider plaintiff's first amendment claim that his discharge was politically motivated independently from his due process claim which we have just dismissed.

As we stated at the beginning, our analysis will look separately at each of the two positions held by plaintiff, i.e., Executive Assistant and Secretary to the Board, and Commercial Director of the Metropolitan Area. The reason for this split image is that we are convinced that under any of the possible alternatives D'Alzina's first amendment rights were not violated. These alternatives are: (1) that D'Alzina's four-month-old job as Commercial Director was confidential; (2) that, given the illegality of his transfer, the only job that we should consider is the one D'Alzina performed for four years (and the one most discussed by the parties), i.e., Executive Assistant (to the President of the Board) and Secretary to the Board and that that job was confidential; or (3) that whether we consider the Commercial Director job or the Executive Assistant one, the fact is that D'Alzina was truly a career employee that could not be dismissed because of his political affiliation and that it was defendants' anti-NPP animus that truly motivated his dismissal. We will discuss each of these possibilities seriatim.

### A. Commercial Director

It is uncontroverted that as Commercial Director, D'Alzina performed, *inter alia*, the following functions: [9]

1. Basic Function. Direct and supervise the Commercial Government and Miscellaneous Account Services in the North/West Metro & Island Area. Responsible for the collections of more than 132 millions per year with a total manpower of 234 employees.[10]

---

**8.** However, the now famous exception, first carved-out in *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), is for the "underlings" of elected officials employed in "policymaking" or "confidential" positions. These last, the Court said, must yield their first amendment rights to the greater interest of preserving representative governments.

**9.** We need not engage in any extensive commentary on the nature of the agency in question vis-á-vis its status as an important policymaking government concern given our Court of Appeal's acceptance, explicit and implicit, that PRTC handles "matters potentially subject to partisan political differences." *Méndez–Palou v. Rohena–Betancourt*, 813 F.2d 1255 at 1258 (1st Cir. 1987). Rather, it is D'Alzina's potential, as a PRTC employee, to influence that agency's responsibility for matters of great public significance that concerns us.

**10.** This listing is not in the exact order nor the same numbering as that found in the official job description, *see* Defendant's Exhibit 14, docket No. 40, but the text is verbatim to the document.

2. Scope. Responsible for obtaining the objectives and goals for the Commercial Services following the established procedures or when necessary formulating and implementing new ones as required by the new needs and demands always striving for the best service possible and the highest standard of commercial relations with our customers at the lowest possible cost for the Company.

3. Work Performed.

a) Direct and supervise the collections efforts and attendance to customers, which include PABX's, business, residentials, and Government Accounts in the North/West & Island Area. Approximately 212,000 telephone accounts and $11,000,000.00 monthly collection effort.

b) Directs the handling of customer's correspondence, request for additional service, public office contacts and remittance section. Establish proper coordination with other departments in relation to customer grievances and contacts for new services as related to station installations and repairs of: a) VIP's b) RML's d) SF e) PABX's and key systems due to visits, telephone calls, and letters addressed to the President, Vicepresident, Group Director or Director's Office.

c) Coordinate and attend departmental, interdepartmental, and intercompany (Directory) meetings, in order, to discuss and resolve operational problems, establish new guidelines, procedures and goals in regard to the Commercial Services performance.

4. Supervision Exercised.

a) Positions Directly Supervised. Commercial Managers Secretary

b) ...

5. Supervision Received.

a) Supervisor. Group Director Customers Services Department.

b) Supervision Received. General as to overall objectives with latitude for exercising initiative and independent judgement.

6. Responsibility and Authority.

a) Employee Relations. Responsible for the promotion of discipline, safety, good housekeeping, good attendance and moral (sic) of employees. Responsible for the hiring, firing, promoting, transferring and disciplining employees.

b) Materials or Products. Responsible for the proper use and care of the materials used in the Department.

c) Equipment. Responsible for the proper use and care of general office equipment and service representative positions.

d) Money. Responsible for hanling (sic), preparing reports, and the deposit for all money received in the Department from subscribers which amounts to approximately $11,000,000 monthly.

e) Business Contacts (Internal and External). Heavy contacts with Departmental and Interdepartmental personnel including top executives of the Company. Heavy contacts with the business community VIP's and goverment (sic) officials, both local and federal.

At the time of his dismissal, D'Alzina was making more than $43,000.00 a year.

As already stated, we are not bound by the labels given a job or the perception of the parties, rather we must simply consider the inherent functions of the job to see if they are *potentially* of a confidential nature. These inherent responsibilities must, of course, potentially "have a bearing on the partisan goals and policies" of the Company. *Méndez–Palou v. Rohena–Betancourt*, 813 F.2d 1255, 1263 (1st Cir.1987).

■ We find that the position at issue involves at least a "modicum" of "policymaking and spokesperson responsibility" on subjects "that would involve political issues." *See Juarbe–Angueira v. Arias*, 831 F.2d 11, 15 (1st Cir.1987); *Méndez–Palou*, 813 F.2d at 1259. The Commercial Director represents the PRTC in many important functions (including customer relations—especially the so-called "VIP's" or very important customers, money collections, personnel, etc.); the position involves several planning and administrative duties that go beyond mere technical labors and involve in some fashion or another, policymaking activities. It is also a high-placed (Director of the largest operational area of the Company), high-paid (almost ten times

the income per capita of Puerto Rico) job with substantial power to control others (234 employees), *see DeAbadia v. Izquierdo Mora,* 792 F.2d 1187, 1194 n. 1 (Campbell, C.J., concurring) ("relative ... power to control others" is "/a/mong the indicia that locate a job along the spectrum between policymaker and clerk.") (citation omitted), authority to speak on the PRTC's behalf, and plenty of opportunity to implement critical policies. *See Goyco De Maldonado,* at 687. It also involves a high degree of self-management and initiative. *See Elrod v. Burns,* 427 U.S. 347, 368, 96 S.Ct. 2673, 2687, 49 L.Ed.2d 547 (1976) ("an employee with responsibilities that are not well defined or are of broad scope more likely functions in a policymaking position"). *Mendez–Palou,* 813 F.2d at 1262.

Therefore, the position of Commercial Director is an "upper-tier" position that clearly affects the politically sensitive activities of PRTC and thus falls within the *Elrod–Branti* exception and is not constitutionally protected.[11]

### B. Executive Assistant and Secretary to the Board of Directors

D'Alzina performed this dual function between 1979 and 1984. The uncontroverted duties of these positions, which apparently were quite symbiotic, are:

> Prepare the agenda for the meetings of the Board of PRTA and coordinate same for the meetings of PRTC, and PRTA, also, he is responsible for attending all meetings of the aforementioned Boards and supervise the preparation of the final minutes, analyze all items submitted for discussion in the agenda and secure additional information that might be required to adequately inform the President of the Board prior to the meetings. Besides, he must secure from management all infor-

mation that the Board's President requires, to be adequately informed as to how the policies of the Board are followed. Also Mr. D'Alzina has been working together with ABI and COMPLAIN (Authority Consultants) in order to ensure that all reports and/or information to the Board are correct, both from the technical and financial point of view; other assignment as given by the Chairman of the Boards.

> Perform all duties assigned by the Chairman of the Boards related to the operations of PRTC, PRCA, PRTA, and TSI, including preparation of reports to the Chairman of the Boards on matters that require policy decisions by the Boards. Acts as liaison between Board President and top management of PRTC, PRCA, PRTA. Performs all duties of the Secretary of the Boards.

(Uncontroverted Official Job Evaluation. Defendants' Exhibit 14 (docket No. 40)).

■ Although D'Alzina protests that his job as Secretary to the Board was of a "secondary" nature,[12] we fail to see the importance of this hierarchical classification. What is crystal clear, however, is the powerfully confidential nature of his *express* duties, let alone the inherent ones we could muster. We feel, for similar reasons to those expressed above regarding his position as Commercial Director, that the job of Executive Aide (or assistant) to the President of the Board, and Secretary to the Board, is one for which political affiliation is "an appropriate requirement for the effective performance of the public office involved." *Branti v. Finkel,* 445 U.S. at 518, 100 S.Ct. at 1295. It is obvious that D'Alzina's former position was at least one that required an extreme amount of confi-

---

**11.** We base this conclusion on our analysis of the hefty record before us which includes undisputed job descriptions and evaluations of the scope of the position(s) at issue. Unlike *Rodríguez–Burgos v. Electric Energy Authority,* 853 F.2d 31 (1st Cir.1988) (reversal of "cursory dismissal of § 1983 complaint filed by the Head of Supplies of the Electric Energy Authority) the Commercial Director position is *not* in the "middle of the spectrum" nor does it involve a "politically neutral task" such as "equipment procurement." Rather, what we have here is a man still

keeping the confidences and influence gained in over four years as a highly trusted executive and further influencing the sensitive matters of the Company by not only managing and fashioning its largest operational area but also toasting and vying for the most powerful clients in Puerto Rico.

**12.** He does not, however, controvert the listing of the duties.

dence (it is also one of only eleven positions deemed as "trust" categories by the Company itself, *see* Defendants' Exhibit 17 attached to docket No. 40) insofar as he was privy to the most sensitive information of both the highest echelon and highest officer of the Company. In addition, D'Alzina was an active participant in the policymaking functions of that body as well as its occasional spokesperson. In point of fact, D'Alzina does not contest the confidential nature of this position but claims that it was only secondary. Whether secondary or not, it is much greater than "inherent" or "potential" which is the only standard we must meet, and in this case we have surpassed it. *Méndez–Palou v. Rohena, supra.* Accordingly, D'Alzina's first position at the Company was, as his last one, not protected by the Constitution pursuant to the *Elrod–Branti* line of cases.

### C. Legitimate Career Position

■ Assuming for the sake of argument that contrary to our discussion above we should hold that D'Alzina did indeed perform a job that can only be categorized as a career one within the protective ambit of *Elrod–Branti,* then our focus must be on whether or not plaintiff has met his burden of showing that political affiliation was a substantial or motivating factor behind his dismissal. We find that he has not met this burden.[13]

Except for codefendant Rafael A. Navarro, and, of course, the PRTC, the complaint states that all the defendants are members of the Popular Democratic Party (PDP) whereas plaintiff is a member of the rival New Progressive Party (NPP). The complaint also states, at paragraph 25, that plaintiff was substituted by an unnamed member of the PDP. Moreover, plaintiff argues that his dismissal was "ordered or procured solely by defendants because of his ideological or political affiliation and/or beliefs which are different from that of defendants." (paragraph 26). And, lastly,

that "/d/efendants have taken a position with respect to job tenure of several other employees identified or affiliated with the Popular Democratic Party (PDP) who were recruited and/or promoted in the same terms and conditions as plaintiff." (paragraph 28).

Like *Kaufman, supra,* we have here a smattering of conclusory arguments generally unsupported in the record with any specific evidence. These allegations are: that the defendants were all members of the PDP; that plaintiff was dismissed almost immediately after the PDP party won the elections; that PDP employees similarly situated to plaintiff were not fired. "Under the standard set forth in *Celotex* and *Anderson,* they/the allegations/are insufficient to generate a *genuine* issue of *material* fact." *Kaufman,* at 1172.

The *Kaufman* court went on to discuss more fully what it considered appellants' strongest but still unavailing argument, i.e., that similarly situated PDP members were not dismissed. The Court concluded: "/a/fter more than sufficient time to discover specific information, such as the names of these individuals and their positions at PRTC, however, the plaintiffs failed to provide the district court with information that would suggest that such an assertion had any factual support." *Id.* at 1172. Given the patent similarities between *Kaufman* and the case at bar, we need do little more than echo the First Circuit's statements. Although the present record is quite extensive and parties' motion practice has been vigorous, the result has been a wealth of documentation and argument on the due process claim and a relative dearth of the same on the first amendment claim. Since it is plaintiff who is the non-movant as to this last claim, and since it is he who has the burden of proving political discrimination at trial, it was his responsibility to provide us with information that would substantiate what still remains rather flimsy evidence.[14]

---

13. For a discussion of our standard of review and consequently of plaintiff's burden *see, supra,* p. 379.

14. We are aware that the very insidiousness of political discrimination or any other form of employment discrimination makes it very difficult to prove. *See Village of Arlington Heights v.*

Although, plaintiff *arguably* met his *prima facie* burden by stating that a PDP member replaced him and that he was fired right after the elections; he has nonetheless totally failed to rebut defendants' legitimate business reason for the firing, i.e., that plaintiff had been hired illegally. *See Mt. Healthy City School District Bd. of Ed. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1974). Here plaintiff has offered little more than a self-serving affidavit and an equivocal deposition statement by codefendant Lausell, *see* docket No. 50, that fails to raise a genuine issue of fact as to whether defendants' stated reason for plaintiff's dismissal was a "pretext." Defendants, on the other hand, have presented sufficient evidence, including affidavits and other documents, that clearly reflect the outrage of several other of the Company's senior employees at the hiring or transfer of D'Alzina to Commercial Director. In fact defendant showed that part of the reason for D'Alzina's dismissal was to maintain peace and save employee morale at the Company. In response, plaintiff has mainly stuck to his conclusory allegations.

In summary, though we stand firmly on our determination that plaintiff held only positions of trust at the Company, we have shown, for the sake of a rounded argument and to deal comprehensively with the motions before us, that even if we were to consider plaintiff to have been a simple career employee he has nonetheless failed to prove that defendants dismissed him for any reason other than that he was illegally hired. Accordingly, we find that political affiliation was not the motivating factor behind plaintiff's dismissal and on this alternative ground we will also dismiss his complaint.

## CONCLUSION

In accordance with the above, plaintiff's motion for partial summary judgment filed on April 30, 1987, docket No. 38, is denied; codefendant PRTC's Motion for Summary Judgment filed on April 30, 1987, docket No. 40, is granted and the other defendants' similar motion filed on April 30, 1987, docket No. 39, is also granted. Accordingly, the complaint is hereby dismissed. Judgment will follow.

IT IS SO ORDERED.

---

*Metropolitan Housing Development Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) (circumstantial evidence can be used to supply inferences of an intent to infringe upon constitutional rights) and *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977) (direct proof of discrimination not required); *but cf. Personnel Administration of Massachusetts v. Feeney,* 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979) (in many cases the circumstances are such that the inferences fail to ripen into proof).