USCA1 Opinion

 

 United States Court of Appeals United States Court of Appeals For the First Circuit For the First Circuit ____________________ No. 93-1417 UNITED STATES, Appellant, v. SALVATORE MANCINI, Defendant, Appellee. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND [Hon. Francis J. Boyle, Senior U.S. District Judge] __________________________ ____________________ Before Boudin and Stahl, Circuit Judges, ______________ and Fuste,* District Judge. ______________ ____________________ Craig N. Moore, Assistant United States Attorney, with whom Edwin _______________ _____ J. Gale, United States Attorney, Ira Belkin, Assistant United States ________ ___________ Attorney, and Margaret E. Curran, Assistant United States Attorney, ___________________ were on brief for appellant. John A. MacFadyen, with whom Richard M. Egbert and Peter DiBiase, _________________ _________________ ______________ were on brief for appellee. ____________________ November 4, 1993 ____________________ _____________________ *Of the District of Puerto Rico, sitting by designation. STAHL, Circuit Judge. In this criminal appeal, we _____________ must decide whether the Mayor of North Providence, Rhode Island, defendant Salvatore Mancini ("Mancini"), has standing1 to challenge a search of the town's archive attic and subsequent seizure of the Mayor's 1987 appointment calendar. The district court ruled in Mancini's favor.2 The government timely filed this interlocutory appeal.3 We affirm the district court's ruling. I. I. __ FACTUAL BACKGROUND FACTUAL BACKGROUND __________________ We recount only those facts relevant to resolving the issue on appeal. On November 20, 1992, a grand jury indicted Mancini on one count of attempted extortion under color of official right, in violation of 18 U.S.C. 1951. ____________________ 1. The inquiry turns, in this case, on whether the defendant demonstrated a legitimate expectation of privacy, see Rakas ___ _____ v. Illinois, 439 U.S. 128 (1978), and we use the term ________ `standing' in the present context as shorthand for that inquiry. United States v. Sanchez, 943 F.2d 110, 113 n.1 _____________ _______ (1st Cir. 1991). 2. After finding that Mancini had standing to contest the search and seizure, the district court went on to grant Mancini's motion to suppress the appointment calendar on the ground that the affidavit used to acquire the search warrant omitted certain facts which, if disclosed to the Magistrate, would have demonstrated a lack of probable cause. On appeal, the government does not contest this finding. Therefore, the only issue before us is the standing question. 3. In relevant part, 18 U.S.C. 3731 provides: "An appeal by the United States shall lie to a court of appeals from a decision or order of the district court suppressing or excluding evidence . . . ." -2- 2 According to the indictment, in November 1987, Mancini accepted a $2,000 payment from real estate developers in exchange for the issuance of certain certificates of occupancy for residential apartments owned by the developers. Prior to the indictment, in the course of investigating the allegations against Mancini, the FBI attempted to obtain the relevant certificates of occupancy. At approximately 4:30 p.m. on October 29, 1992, two FBI agents, Timothy O'Keefe and Charles Prunier, went to the North Providence Town Hall to interview the town's building inspector, Albert DiPetrillo, and to serve him with grand jury subpoenas calling for his testimony and for the production of the eleven allegedly illegal certificates of occupancy. The subpoenas required production of the certificates by 9:30 the following morning. DiPetrillo told the agents that Town Hall records were kept in a room known as the archive attic. Both the maintenance and personnel departments had keys to the attic. At DiPetrillo's direction, another town employee, Robert Hennessey, obtained the keys to the attic from a maintenance worker and accompanied the two agents through two locked doors and into the attic. The attic, which is above and runs the length of the Town Hall, contained boxes of records and miscellaneous equipment, none of which appeared to the agents to be organized in any particular manner. -3- 3 When the three men first entered the attic, Hennessey suggested to the agents that they might find the certificates in boxes of Building Department records located near the door through which they had just passed. An initial examination of those boxes did not uncover the certificates. Hennessey then informed the agents that there were two other rooms in the attic containing town records. After a cursory examination of the other rooms indicated that only records from before 1940 were present, the three men returned to the room they had entered first. The agents again began looking for the certificates in the boxes located in this room. According to Hennessey's testimony at the suppression hearing, he directed the agents to a particular stack of boxes. Agent Prunier, however, "wandered off" in another direction. At some point, Prunier came across a box labelled "Mayor's Appointment Books." The flaps on the box were turned down to cover the top of the box, but they were not interlocked. Prunier lifted the flaps and saw that the box did, in fact, contain appointment books, including a book for 1987.4 Prunier browsed through the 1987 book and replaced it in the box. Meanwhile, Agent O'Keefe located the sought- after certificates of occupancy in one of the boxes in the ____________________ 4. The appointment book here at issue is a rather typical red-covered office calendar, with one page devoted to each day of 1987. The hard cover reads "Appointments," with "1987" appearing underneath. The inside front cover is denoted "1987 Half Hourly Standard Appointment Diary." -4- 4 area that Hennessey had originally suggested. This search lasted approximately two hours. On November 16, 1992, the FBI applied for a warrant to search the archive attic and seize the 1987 appointment calendar. A Magistrate Judge signed the warrant, and it was executed the same day. The calendar was retrieved. According to the government, the calendar is significant because of an entry made on November 24, 1987, a few days before the alleged illegal payoff and one day before the certificates were issued. That entry indicates that Mancini had a noon appointment with Art Aloisio, who, according to Kenneth Stoll, arranged the meeting where Stoll allegedly made the payoff to the Mayor.5 Prior to trial, Mancini moved to suppress the appointment calendar because 1) the agents' initial discovery of the calendar was the result of a warrantless, illegal search, and 2) the later search, executed pursuant to a warrant, was both the fruit of the first, illegal search and ____________________ 5. The calendar entry took on greater importance in the face of Stoll's credibility problems. During the suppression hearing, F.B.I. Agent Joyce, who signed the search warrant affidavit, conceded that Stoll, who was to be a prosecution witness, had lied on several occasions to the F.B.I. and United States Attorney's office. In fact, the government had rescinded a non-prosecution agreement it had previously reached with Stoll because it believed that Stoll had breached his obligation to speak truthfully. None of Stoll's credibility problems were divulged to the Magistrate, leading to the portion of the district court's suppression order that is not here appealed. -5- 5 the product of a misleading affidavit. Following a suppression hearing,6 the district court first found that Mancini had standing to contest the search and seizure. Addressing the merits, the court then rejected Mancini's claim that the agents' conduct in discovering the calendar was illegal. The court concluded, however, that the subsequent search warrant should never have been issued due to the government's failure to disclose the negative information concerning Stoll. Therefore, the court granted the motion to suppress. As noted earlier, the government only challenges the court's standing determination. II. II. ___ STANDARD OF REVIEW STANDARD OF REVIEW __________________ In reviewing the district court's suppression order, we uphold findings of fact, including mixed fact/law findings, unless they are clearly erroneous. See United ___ ______ States v. Carty, 993 F.2d 1005, 1008 (1st Cir. 1993) (factual ______ _____ ____________________ 6. At the suppression hearing, Prunier, Joyce, and Mayoral Chief of Staff Leo J. Perrotta were called to testify by the government. Hennessey was the only witness called by the defense. Mancini did not testify, but submitted an affidavit stating that in 1987 he kept a daily calendar diary which was "maintained as a personal rather than a public document," that the diary was "kept in a closed box marked Mayor's Appointment Books" located in the locked archive room, and that he instructed his Chief of Staff that "no one was to have access to any of my boxes, including the box containing the calendars, without permission." Mancini further stated that "[a]t all times, I believed that my boxes, including the one containing the calendars, were my private property, were under my control, and were to be left alone by all persons, including town personnel." -6- 6 findings); United States v. Rodriguez-Morales, 929 F.2d 780, _____________ _________________ 783 (1st Cir. 1991) (mixed findings), cert. denied, 112 S. Ct. 868 (1992). We _____ ______ review conclusions of law de novo. Carty, 993 F.2d at 1008. __ ____ _____ The legal standard used by the district court is also subject to plenary review. Sanchez, 943 F.2d at 112. _______ It is well settled that a defendant who fails to demonstrate a legitimate expectation of privacy in the area searched or the item seized will not have "standing" to claim that an illegal search or seizure occurred. Rakas, 439 U.S. _____ at 138-48; Sanchez, 943 F.2d at 112-13. In order to make such _______ a demonstration, the defendant must show both a subjective expectation of privacy and that society accepts that expectation as objectively reasonable. California v. __________ Greenwood, 486 U.S. 35, 39 (1988); Katz v. United States, 389 _________ ____ _____________ U.S. 347, 361 (1967)(Harlan, J. concurring). The burden of proving a reasonable expectation of privacy lies with the defendant. Sanchez, 943 F.2d at 113. The defendant must _______ demonstrate a privacy expectation in both the item seized and the place searched. United States v. Salvucci, 448 U.S. 83, ______________ ________ 93 (1980) ("[W]e must . . . engage in a conscientious effort to apply the Fourth Amendment by asking not merely whether the defendant had a possessory interest in the items seized, but whether he had an expectation of privacy in the area searched.")(internal quotations omitted); United States v. _____________ -7- 7 Aguirre, 839 F.2d 854, 856 (1st Cir. 1988)("Before embarking _______ upon the merits of a suppression challenge, a criminal defendant must show that he had a reasonable expectation of privacy in the area searched and in relation to the items seized."). III. III. ____ DISCUSSION DISCUSSION __________ In determining that Mancini had standing to contest the search, the district court first ruled that the appointment book was not a public record. United States v. _____________ Mancini, No. 92-117B, slip op. at 4 (D.R.I. April 12, 1993). _______ Then, the court concluded that the act of placing the book into a box "does not remove the document from the mayor's files." Id. Finally, the court stated that it is not __ "significant that the record was not found in the physical confines of the Mayor's office. It was where it could expected [sic] to be, a 1987 document, in the archives." Id. ___ at 4-5. On this appeal, the government argues that the district court erroneously found that the calendar was a non- public document, and further contends that Mancini did not, and could not, demonstrate a privacy expectation in the archive attic. We address the two issues in turn. A. The Mayor's Appointment Calendar A. The Mayor's Appointment Calendar ____________________________________ In finding that Mancini's appointment calendar is a "non-public record," the district court analogized the -8- 8 calendar to the personal effects located in the desk and file cabinets of a public employee in O'Connor v. Ortega, 480 U.S. ________ ______ 709 (1987). In Ortega, the Supreme Court ruled that the ______ defendant, Dr. Ortega had a reasonable expectation of privacy in his desk and file cabinets, both of which were located in his office. Id. at 718.7 The Court found significant the ___ personal nature of the items in the desk and file cabinets, "which included personal correspondence, medical files, correspondence from private patients unconnected to the Hospital, personal financial records, teaching aids and notes, and personal gifts and mementos." Id. The papers ___ were not exclusively private, however, as was demonstrated by the testimony of one of the investigators who tried to separate the personal items from the public documents. Id. ___ at 713 ("`Trying to sort State from non-State, it was too much to do, so I gave it up and boxed it up.'"). Like the papers contained in Dr. Ortega's files and desk, the Mayor's personal and public calendar entries are intermingled. In many instances, it is impossible to classify an appointment as one or the other. Names of public officials alone, jotted down next to a preprinted hour of the ____________________ 7. Before addressing the specifics of Dr. Ortega's case, the Court first rejected the Solicitor General's position that public employees can never have a reasonable expectation of privacy in their place of work. Ortega, 480 U.S. at 717. ______ The government here makes no such claim. -9- 9 day, do not reveal the context of the intended meeting. Thus, we are not persuaded by the government's argument that we should resolve this issue mathematically, by calculating and comparing the number of facially public versus non-public appointments contained in the calendar. Even if the ratio could be divined, we believe the proper inquiry to be one of composite nature, not number. A perusal of the calendar reveals that many of the Mayor's entries were intended to remind him of such clearly personal activities as christenings, bachelor dinners, doctor appointments and weddings; some even concern his personal plans for holidays. We are persuaded that these entries make the overall nature ______ of the calendar sufficiently non-public to justify a legitimate expectation of privacy. Moreover, although Mancini's secretaries had access to the appointment calendar,8 shared access to a document does not prevent one from claiming Fourth Amendment protection in that document. See Mancusi v. DeForte, 392 ___ _______ _______ U.S. 364, 369 (1968)(exclusive access to an office or to documents contained within an office is not a prerequisite to claiming Fourth Amendment protection). ____________________ 8. By all accounts, Mancini's appointment calendar is typical of the kind of calendar maintained by business and professional people. The daily log appeared to be maintained by secretaries who worked for the Mayor, the same way business calendars are often maintained by personal assistants. -10- 10 B. The Attic Archive Room in City Hall B. The Attic Archive Room in City Hall _______________________________________ Accepting the district court's conclusion that the appointment book had a sufficiently personal character to justify Fourth Amendment protection, the question remains whether Mancini had a reasonable expectation of privacy in the place searched. The district court said that the appointment book was "not remove[d]...from the mayor's files," but rather was found where a 1987 file could be "expected to be [found], in the archives." We do not, however, think this is conclusive. As we have stated: The most intimate of documents, if left strewn about in the most public of places, would surely not [give rise to an expectation of privacy]. That the items seized were appellant's personal effects was a mark in his favor--but without competent evidence to show that they were left in a place and under circumstances which could (and did) give rise to an expectation of privacy, the mark fell far short. United States v. Aguirre, 839 F.2d 854, 857 (1st Cir. 1988) _____________ _______ (footnote omitted). Accordingly, we turn our attention to the question of Mancini's privacy interest in a box in the archive attic. On appeal, both sides rely on cases involving searches of business premises.9 In the government's view, ____________________ 9. We agree, for purposes of this appeal, that cases involving business premises searches are sufficiently analogous to provide guidance. -11- 11 these cases establish that an employee can have an expectation of privacy only in his or her own work area. Not surprisingly, Mancini takes the opposite view, i.e., that case law establishes "beyond peradventure" that an employee's expectation of privacy is not limited to his own work area. The truth lies somewhere in between. It is undisputed that, under certain circumstances, a corporate officer or employee may assert a reasonable expectation of privacy in his/her corporate offices even if shared with others, and may have standing with respect to searches of corporate premises and records. See, e.g., ___ ____ Mancusi 392 U.S. at 369 ("It has long been settled that one _______ has standing to object to a search of his office as well as his home."). In addition, "[g]iven the great variety of work environments in the public sector, the question whether an employee has a reasonable expectation of privacy must be addressed on a case-by-case basis." Ortega, 480 U.S. at 718. ______ We consider the following factors to be especially relevant to the standing determination: "ownership, possession and/or control; historical use of the property searched or the thing seized; ability to regulate access; the totality of the surrounding circumstances; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of such an expectancy under the facts of a given case." -12- 12 See Sanchez, 943 F.2d at 113 (quoting United States v. ___ _______ _____________ Aguirre, 839 F.2d 854, 856-57 (1st Cir. 1988)). We also take _______ notice of the position of authority held by the party asserting his/her fourth amendment rights. United States v. _____________ Brien, 617 F.2d 299, 306 (1st Cir. 1980). _____ In United States v. Moscatiello, 771 F.2d 589, 601 _____________ ___________ (1st Cir. 1985), we reversed a district court decision which denied two individual defendants standing to contest the search of a warehouse which was owned by a corporation and used to store marijuana before transport. We rejected the district court's reasoning that the defendants lacked standing because they neither owned the warehouse nor used any portion of it for personal matters. Id. at 601. ___ Instead, we noted that the defendants, along with two others, furnished the money to buy the warehouse in the name of a corporation in which they held all the stock. This, we concluded, gave them a proprietary interest in the building. Id. Of more importance, however, was the fact that only the ___ defendants and one of their coconspirators had keys to the warehouse, that the warehouse was kept locked, that very few people had access to it, and that the defendants did, in fact, keep some personal property there. Id. We therefore ___ determined that the defendants had standing to contest the warehouse search. Id. ___ -13- 13 In United States v. Thornley, 707 F.2d 622, 624-25 _____________ ________ (1st Cir. 1983), on the other hand, we upheld the district court's rejection of a standing claim made by a defendant who had removed incriminating documents from his business and had stored them in the basement of a three-tenant apartment building owned by a close friend. Id. at 624-25. We found ___ that several factors militated against defendant having an objective expectation of privacy, including the facts that the storage area was a common area that was not kept locked and that access was possible through an old hole in a sidewall. Id. at 624. Also, we noted that the area had been ___ used by a tenant long before defendant's use of it, and that the tenant was never told that her use was prohibited. Id. ___ at 624-25. Finally, we observed that the basement was open not only to tenants, but to children who used it as a play area. Id. at 625. These facts, combined with the fact that ___ the defendant was not a tenant of the building and lacked any evidence to support his expectation of privacy claim, compelled us to conclude that the defendant "could not insulate himself against the discovery of incriminating material by . . . hiding it in a place . . . in which [he] had no legal interest or even access rights." Id. ___ (quotations omitted). Finally, in Brien, we affirmed the district court's _____ finding of an expectation of privacy on the part of corporate -14- 14 employees in business records seized from areas of the corporate office other than their own work stations. Brien, _____ 617 F.2d at 306. In so doing, we approved the district court's focus on the following factors: 1) each defendant's position in the firm; 2) his ownership interest; 3) his responsibilities; 4) his power to exclude others from the area; 5) whether he worked in the area; and 6) his presence at the time of the search. Id. We also found it relevant ___ that the office in question was noteworthy for its extreme security measures. Id. at n.9.10 ___ Although we are clearly grappling with matters of degree, the facts here, in light of the foregoing precedents, persuade us that the Mayor has demonstrated an objectively reasonable expectation of privacy in the archive attic. Mancini was mayor of the city of North Providence for nineteen years, throughout which he maintained his office in the same building. The archive attic, as noted previously, was upstairs in the very building in which Mancini worked throughout his tenure in political office. Moreover, the record shows that Mancini took steps to assure that no one ____________________ 10. Some standing decisions turn on the applicability of certain business regulations that may reduce one's reasonable expectation of privacy. See, e.g. United States v. Leary, ___ ____ _____________ _____ 846 F.2d 592, 596-98 (10th Cir. 1988) (exporting); United ______ States v. Chuang, 897 F.2d 646, 649-51 (2d Cir. 1990) ______ ______ (banking), cert. denied, 498 U.S. 824 (1990). No such _____ ______ regulations apply to this case. -15- 15 would have access to his files without his prior authorization.11 Finally, we note that Mancini's belongings were clearly labeled and were segregated from other items in the secured archive attic. Accordingly, Mancini could have expected that only members of the maintenance or personnel staff, who had instructions not to disturb the Mayor's boxes, could enter the attic, and that his personal records would not be touched except with his permission or that of his Chief of Staff. Cf. Mancusi, 392 U.S. at 369. In our opinion, Mancini's ___ _______ actions demonstrate an expectation of privacy in the archive attic which we find to be objectively reasonable. IV. IV. ___ CONCLUSION CONCLUSION __________ For the foregoing reasons, we hold that Mancini has standing to challenge the search and seizure here at issue. Accordingly, the ruling of the district court is affirmed. affirmed ________ ____________________ 11. In addition to Mancini's sworn statement that he specifically "instructed my Chief of Staff that no one was to have access to any of my boxes, including the box containing the calendars, without permission," Robert Hennessey, a city employee, testified as follows: Q. Did you have permission to go into this box? A. No. Q. Did you have permission to go into any of the Mayor's property in the archives? A. No. Q. Who, if you know, was the only person authorized to permit entry into those boxes? A. I would say the Mayor or Leo Perrotta [the Mayor's Chief of Staff]. -16- 16