UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT



No. 96-2061

HECTOR VEGA-RODRIGUEZ, ET AL.,

Plaintiffs, Appellants,

v.

PUERTO RICO TELEPHONE COMPANY, ET AL.,

Defendants, Appellees.



APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Juan M. Perez-Gimenez, U.S. District Judge] 



Before

Selya, Circuit Judge, 

Coffin, Senior Circuit Judge, 

and Stahl, Circuit Judge. 



Rick Nemcik-Cruz, with whom Charles S. Hey-Maestre was on 
brief, for appellants.
Vannessa Ramirez, Assistant Solicitor General, Puerto Rico 
Dep't of Justice, with whom Carlos Lugo-Fiol, Solicitor General, 
Garcia & Fernandez, and John M. Garcia were on brief, for 
appellees.



April 8, 1997


SELYA, Circuit Judge. As employers gain access to SELYA, Circuit Judge. 

increasingly sophisticated technology, new legal issues seem

destined to suffuse the workplace. This appeal raises such an

issue. In it, plaintiffs-appellants Hector Vega-Rodriguez (Vega)

and Amiut Reyes-Rosado (Reyes) revile the district court's

determination that their employer, the Puerto Rico Telephone

Company (PRTC), may monitor their work area by means of

continuous video surveillance without offending the

Constitution.1 Because the red flag of constitutional breach

does not fly from these ramparts, we affirm.

I. FACTUAL SURVEILLANCE I. FACTUAL SURVEILLANCE

In conformity with accepted summary judgment protocol,

we recount the undisputed facts in the light most congenial to

the appellants and adopt their version of any contested facts

which are material to our consideration of the issues. See, 

e.g., Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 

1990).

The Executive Communications Center (the Center) is

located in the penthouse of the PRTC's office complex in

Guaynabo, Puerto Rico. It maintains communication between the

company's various operating units and the senior executive on

duty, but it does not have primary corporate responsibility for
 

1To the extent that other parties are involved in this
litigation for example, the plaintiffs' complaint identifies
their wives and conjugal partnerships as additional plaintiffs
and names two PRTC executives as codefendants their presence
makes no discernible difference from an analytic standpoint.
Consequently, we treat the case as if it involved only Vega,
Reyes, and PRTC.

2

security and it does not house communication switching centers,

cables, transmission lines, or kindred equipment. For security

reasons, access to the Center is restricted; both the elevator

foyer on the penthouse floor and the doors to the Center itself

are inaccessible without a control card.

PRTC employs Vega, Reyes, and others as attendants

(known colloquially as "security operators") in the Center. They

monitor computer banks to detect signals emanating from alarm

systems at PRTC facilities throughout Puerto Rico, and they alert

the appropriate authorities if an alarm sounds. Although

individual employees work eight-hour shifts, the Center is

staffed around the clock.

The work space inside the Center consists of a large L-

shaped area that contains the computers, the monitors, and

assorted furniture (e.g., desks, chairs, consoles). The work

space is completely open and no individual employee has an

assigned office, cubicle, work station, or desk.

PRTC installed a video surveillance system at the

Center in 1990 but abandoned the project when employees groused.

In June of 1994, the company reinstated video surveillance.

Three cameras survey the work space, and a fourth tracks all

traffic passing through the main entrance to the Center. None of

them cover the rest area. The surveillance is exclusively

visual; the cameras have no microphones or other immediate

eavesdropping capability. Video surveillance operates all day,

every day; the cameras implacably record every act undertaken in

3

the work area. A video monitor, a switcher unit, and a video

recorder are located in the office of the Center's general

manager, Daniel Rodriguez-Diaz, and the videotapes are stored

there. PRTC has no written policy regulating any aspect of the

video surveillance, but it is undisputed that no one can view

either the monitor or the completed tapes without Rodriguez-

Diaz's express permission.

Soon after PRTC installed the surveillance system

(claiming that it was desirable for security reasons), the

appellants and several fellow employees protested. They

asserted, among other things, that the system had no purpose

other than to pry into employees' behavior. When management

turned a deaf ear, the appellants filed suit in Puerto Rico's

federal district court. They contended that the ongoing

surveillance constitutes an unreasonable search prohibited by the

Fourth Amendment, violates a constitutionally-conferred

entitlement to privacy, and abridges rights secured by the First

Amendment. After the parties had taken considerable discovery,

PRTC moved for dismissal and/or summary judgment, and the

individual defendants moved for summary judgment. The district

court found merit in these submissions and entered judgment

accordingly. The appellants then prosecuted this appeal.

In the pages that follow, we deal first with a problem

of how best to characterize the district court's ruling. We then

address the appellants' illegal search and invasion of privacy

claims. Because the appellants have neither briefed nor argued

4

their First Amendment claim in this venue, we deem it waived and

do not pursue it.

II. THE CHARACTERIZATION QUESTION II. THE CHARACTERIZATION QUESTION

In an effort to put the characterization question into

perspective, we trace the events leading up to the lower court's

dispositive ruling. PRTC moved in the alternative for dismissal,

Fed. R. Civ. P. 12(b)(6), or summary judgment, Fed. R. Civ. P.

56. In passing upon the motion, the district court employed the

idiom of Rule 12(b)(6) (i.e., it said that it was dismissing the

suit for failure to state a claim upon which relief might be

granted), but the praxis of Rule 56 (i.e., it considered

materials dehors the pleadings). It is imperative that we

clarify these mixed signals; although these two rules share a

certain family resemblance both are designed to cut short the

litigation of cases that do not reach a threshold of

trialworthiness they operate from different legal templates.

We conclude that the district court's order ought to be tested

against the summary judgment standard.

We start from the text of Rule 12(b), which stipulates

that if "matters outside the pleading are presented to and not

excluded by the court," a motion brought under Rule 12(b)(6)

"shall be treated as one for summary judgment and disposed of as

provided in Rule 56." We have noted before that the proper

approach to incipient conversion questions implicating these

rules is functional, not mechanical. See Garita Hotel Ltd. 

5

Partnership v. Ponce Fed. Bank, F.S.B., 958 F.2d 15, 18-19 (1st 

Cir. 1992) (stating the test as "whether the court actually took

cognizance of [supplementary materials], or invoked Rule 56, in

arriving at its decision").

Here, language in the district court's ruling indicates

that it must have considered materials outside the pleadings.

Thus, under the Garita Hotel test, conversion is proper. This 

circumstance militates strongly in favor of treating the lower

court's decree as one granting summary judgment. Perhaps the

only factor that tugs in a different direction is the district

judge's choice of phrase but an appellate tribunal is not bound

by the label that a district court attaches to its rulings. See, 

e.g., Estate of Soler v. Rodriguez, 63 F.3d 45, 47 n.1 (1st Cir. 

1995); cf. Cloutier v. Town of Epping, 714 F.2d 1184, 1188 (1st 

Cir. 1983) (affirming dismissal under the summary judgment

standard although the lower court had dismissed for lack of

jurisdiction under Fed. R. Civ. P. 12(b)(1) - (2)).

We hasten to add that application of the summary

judgment standard produces no perceptible unfairness. PRTC's

motion invoked Rule 56 as one of two possible avenues for relief,

and the dispositive motions filed by the individual defendants

asked exclusively for summary judgment. The appellants responded

to these motions in kind. By that time, there had been an

adequate opportunity for discovery and the record was well-

6

developed.2 We therefore treat the challenged ruling as an order

for summary judgment.

Before ending this discussion, we pause to rehearse the

summary judgment standard. Given the standard's familiarity, a

lengthy exegesis is unnecessary. It suffices to say that we

must undertake de novo review, construing all reasonable

inferences from the evidence in the nonmoving party's favor. See 

Garside, 895 F.2d at 48. Since the core purpose of summary 

judgment is to "pierce the boilerplate of the pleadings" and

examine the parties' proof to determine whether a trial actually

is necessary, Wynne v. Tufts Univ. Sch. of Med., 976 F.2d 791, 

794 (1st Cir. 1992), the entry of summary judgment is appropriate

if (and only if) no genuine issue exists as to any material fact

and the moving party is entitled to judgment as a matter of law.

See id.; see also Fed. R. Civ. P. 56(c). In applying this 

formulation, a fact is "material" if it potentially affects the

outcome of the case, and an issue is "genuine" if the probative

evidence on it conflicts. See Garside, 895 F.2d at 48. 

III. THE FOURTH AMENDMENT III. THE FOURTH AMENDMENT

PRTC is a quasi-public corporation. See P.R. Laws Ann. 

tit. 27, 401-424 (1991). It is, therefore, a government

 

2To be sure, the appellants opposed summary judgment in part
for want of an opportunity to depose PRTC's president, Agustin
Garcia-Acevedo. But the appellants who conceded at oral
argument in this court that it would not be unfair to scrutinize
the district court's order under Rule 56 did not renew that
objection on appeal. At any rate, given our ratio decidendi, it 
is difficult to imagine how this deposition, if taken, might
shore up the appellants' case.

7

actor, see Kauffman v. PRTC, 841 F.2d 1169, 1170 (1st Cir. 1988); 

Torres-Ponce v. Jimenez, 113 P.R. Dec. 58, translated in 13 P.R. 

Sup. Ct. Off'l Trans. 77, 91-93 (1982), subject to the suasion of

the Fourth Amendment, see Buenrostro v. Collazo, 973 F.2d 39, 43 

(1st Cir. 1992). Building on this foundation, the appellants

allege that PRTC's continuous video surveillance contravenes the

"right of the people to be secure in their persons . . . against

unreasonable searches." U.S. Const. amend. IV. We consider that

allegation.

A. Privacy Rights and the Fourth Amendment. A. Privacy Rights and the Fourth Amendment. 

Intrusions upon personal privacy do not invariably

implicate the Fourth Amendment. Rather, such intrusions cross

the constitutional line only if the challenged conduct infringes

upon some reasonable expectation of privacy. See Smith v. 

Maryland, 442 U.S. 735, 740 (1979).3 To qualify under this 

mantra, a privacy expectation must meet both subjective and

objective criteria: the complainant must have an actual

expectation of privacy, and that expectation must be one which

society recognizes as reasonable. See Oliver v. United States, 

466 U.S. 170, 177 (1984); Smith, 442 U.S. at 740. Determining 

the subjective component of the test requires only a

straightforward inquiry into the complainant's state of mind,

and, for purposes of this appeal, we are willing to assume

arguendo that the appellants, as they profess, had some 
 

3In this context, courts tend to use adjectives like
"reasonable," "legitimate," or "justifiable" interchangeably.
See Smith, 442 U.S. at 740. 

8

subjective expectation of privacy while at work. We turn, then,

to the objective reasonableness of the asserted expectation of

privacy.

In previous cases, the Supreme Court has answered this

type of question by examining such diverse factors as the

Framers' intent, the uses to which an individual has put a

location, and society's understanding that certain areas (say, a

person's home) deserve heightened protection from government

intrusions. See Oliver, 466 U.S. at 178. But the Court has not 

developed a routinized checklist that is capable of being applied

across the board, and each case therefore must be judged

according to its own scenario. See, e.g., United States v. 

Mancini, 8 F.3d 104, 109 (1st Cir. 1993) (considering, inter 

alia, the totality of circumstances, the ability to regulate 

access to particular premises, and the individual's status).

With this in mind, we proceed by first surveying the legal

principles that relate to searches of business premises and then

narrowing our focus to the facts of this case and the appellants'

asseverational array.

B. Privacy Rights and Business Premises. B. Privacy Rights and Business Premises. 

Generally speaking, business premises invite lesser

privacy expectations than do residences. See G.M. Leasing Corp. 

v. United States, 429 U.S. 338, 353 (1977); 1 Wayne R. LaFave, 

Search & Seizure 2.4(b) (3d ed. 1996). Still, deeply rooted 

societal expectations foster some cognizable privacy interests in

business premises. See Oliver, 466 U.S. at 178 n.8; Mancusi v. 

9

DeForte, 392 U.S. 364, 367 (1968). The Fourth Amendment 

protections that these expectations entail are versatile; they

safeguard individuals not only against the government qua law 

enforcer but also qua employer. See National Treasury Employees 

Union v. Von Raab, 489 U.S. 656, 665 (1989). 

The watershed case in this enclave of Fourth Amendment

jurisprudence is O'Connor v. Ortega, 480 U.S. 709 (1987). 

O'Connor's central thesis is that a public employee sometimes may 

enjoy a reasonable expectation of privacy in his or her workplace

vis- -vis searches by a supervisor or other representative of a

public employer. Withal, O'Connor recognized that "operational 

realities of the workplace," such as actual office practices,

procedures, or regulations, frequently may undermine employees'

privacy expectations. Id. at 717 (plurality op.). The four 

dissenting Justices shared this belief, see id. at 737 (Blackmun, 

J., dissenting), and subsequent case law confirms it, see, e.g., 

Von Raab, 489 U.S. at 669-72. In the last analysis, the 

objective component of an employee's professed expectation of

privacy must be assessed in the full context of the particular

employment relation. See O'Connor, 480 U.S. at 717; Mancini, 8 

F.3d at 109.

O'Connor is a typical case in which a public employee's 

workplace-based privacy interests were vindicated. Dr. Ortega

was on administrative leave from his post at a state hospital

when hospital personnel, investigating misconduct charges,

entered his office and removed personal items from his desk and

10

file cabinets. 480 U.S. at 712-13. The Court held that Dr.

Ortega had a reasonable expectation of privacy in his desk and

file cabinets because he did not share them with other workers,

he used them to store personal materials, and the hospital had no

policy discouraging employees from stashing personal items there.

See id. at 718-19. Moreover, although the plurality eschewed the 

issue, a majority of the Justices believed that Dr. Ortega

maintained a reasonable privacy expectation in his private office

as well. See id. at 731-32 (Scalia, J., concurring); id. at 732 

(Blackmun, J., dissenting).

Applying O'Connor in various work environments, lower 

federal courts have inquired into matters such as whether the

work area in question was given over to an employee's exclusive

use, compare Thompson v. Johnson County Community Coll., 930 F. 

Supp. 501, 507 (D. Kan. 1996) (finding no reasonable expectation

of privacy against video surveillance of an unenclosed locker

area not sealed from view or provided for any employee's

exclusive use) with United States v. Taketa, 923 F.2d 665, 673 

(9th Cir. 1991) (finding a reasonable expectation of privacy

against surreptitious video surveillance by DEA agents in an

office reserved for the defendant's exclusive use), the extent to

which others had access to the work space, see O'Bryan v. KTIV 

Television, 868 F. Supp. 1146, 1159 (N.D. Iowa 1994) (finding no 

reasonable expectation of privacy in an unlocked desk and

credenza located in an "open, accessible area" of the station),

the nature of the employment, see Sheppard v. Beerman, 18 F.3d 

11

147, 152 (2d Cir. 1994) (finding that a law clerk had no

reasonable expectation of privacy in chambers' appurtenances,

desks, file cabinets, or other work spaces due to the open access

of documents between judges and clerks), and whether office

regulations placed employees on notice that certain areas were

subject to employer intrusions, compare Schowengerdt v. United 

States, 944 F.2d 483, 488 (9th Cir. 1991) (finding no reasonable 

expectation of privacy in either office or locked credenza when

engineer knew of security regimen, including daily office

searches) and American Postal Workers Union v. United States 

Postal Serv., 871 F.2d 556, 560-61 (6th Cir. 1989) (finding no 

reasonable expectation of privacy against search of employees'

lockers when employer had promulgated regulations expressly

authorizing random inspections in certain circumstances) with 

Taketa, 923 F.2d at 672-73 (finding that unenforced regulations 

did not defeat an otherwise reasonable expectation of privacy)

and McGregor v. Greer, 748 F. Supp. 881, 888 (D.D.C. 1990) 

(finding that public employee's own desk or office, normally not

entered by co-workers or superiors, may engender a reasonable

expectation of privacy in the absence of any policy or regulation

warning otherwise).

C. Privacy Interests in the Appellants' Workplace. C. Privacy Interests in the Appellants' Workplace. 

We begin with first principles. It is simply

implausible to suggest that society would recognize as reasonable

an employee's expectation of privacy against being viewed while

toiling in the Center's open and undifferentiated work area.

12

PRTC did not provide the work station for the appellants'

exclusive use, and its physical layout belies any expectation of

privacy. Security operators do not occupy private offices or

cubicles. They toil instead in a vast, undivided space a work

area so patulous as to render a broadcast expectation of privacy

unreasonable. See O'Connor, 480 U.S. at 717-18. 

The precise extent of an employee's expectation of

privacy often turns on the nature of an intended intrusion. See 

id. at 717-18; id. at 738 (Blackmun, J., dissenting). In this 

instance the nature of the intrusion strengthens the conclusion

that no reasonable expectation of privacy attends the work area.

Employers possess a legitimate interest in the efficient

operation of the workplace, see id. at 723, and one attribute of 

this interest is that supervisors may monitor at will that which

is in plain view within an open work area. Here, moreover, this

attribute has a greater claim on our allegiance because the

employer acted overtly in establishing the video surveillance:

PRTC notified its work force in advance that video cameras would

be installed and disclosed the cameras' field of vision.4 Hence,
 

4While this circumstance bears heavily on both the
subjective and objective reasonableness of an employee's
expectation of privacy, we do not mean to imply that an employer
always can defeat an expectation of privacy by pre-announcing its
intention to intrude into a specific area. See, e.g., Smith, 442 
U.S. at 740 n.5 (hypothesizing that "if the Government were
suddenly to announce on nationwide television that all homes
henceforth would be subject to warrantless entry," individuals
still might entertain an actual expectation of privacy regarding
their homes, papers, and effects); see also Heather L. Hanson, 
Note, The Fourth Amendment in the Workplace: Are We Really Being 
Reasonable?, 79 Va. L. Rev. 243, 250-52 (1993). In cases in 
which notice would contradict expectations that comport with

13

the affected workers were on clear notice from the outset that

any movements they might make and any objects they might display

within the work area would be exposed to the employer's sight.

The appellants concede that, as a general matter,

employees should expect to be under supervisors' watchful eyes

while at work. But at some point, they argue, surveillance

becomes unreasonable. In their estimation, when surveillance is

electronic and, therefore, unremitting the camera, unlike the

human eye, never blinks the die is cast. In constitutional

terms, their theory reduces to the contention that the Fourth

Amendment precludes management from observing electronically what

it lawfully can see with the naked eye. This sort of argument

has failed consistently under the plain view doctrine, and it

musters no greater persuasiveness in the present context.5 See 1 

LaFave, supra, 2.7(f) (expressing skepticism about finding a 

Fourth Amendment violation by fixed police video surveillance of

a person's public activities). When all is said and done,

employees must accept some circumscription of their liberty as a

condition of continued employment. See INS v. Delgado, 466 U.S. 

210, 218 (1984).

Once we put aside the appellants' theory that there is

 

traditional Fourth Amendment freedoms, a normative inquiry is
proper to determine whether the privacy expectation is
nonetheless legitimate. See Hudson v. Palmer, 468 U.S. 517, 525 
n.7 (1984); Smith, 442 U.S. at 740 n.5. 

5We caution, however, that cases involving the covert use of
clandestine cameras, or cases involving electronically-assisted
eavesdropping, may be quite another story.

14

something constitutionally sinister about videotaping, their case

crumbles. If there is constitutional parity between observations

made with the naked eye and observations recorded by openly

displayed video cameras that have no greater range, then objects

or articles that an individual seeks to preserve as private may

be constitutionally protected from such videotaping only if they

are not located in plain view. See Taketa, 923 F.2d at 677. In 

other words, persons cannot reasonably maintain an expectation of

privacy in that which they display openly. Justice Stewart

stated the proposition in no uncertain terms three decades ago:

"What a person knowingly exposes to the public, even in his own

home or office, is not a subject of Fourth Amendment protection."

Katz v. United States, 389 U.S. 347, 351 (1967). Consequently, 

no legitimate expectation of privacy exists in objects exposed to

plain view as long as the viewer's presence at the vantage point

is lawful. See Horton v. California, 496 U.S. 128, 133, 137 

(1990); Oliver, 466 U.S. at 179. And the mere fact that the 

observation is accomplished by a video camera rather than the

naked eye, and recorded on film rather than in a supervisor's

memory, does not transmogrify a constitutionally innocent act

into a constitutionally forbidden one.6 See 1 LaFave, supra,  

 

6It is true, as the appellants repeatedly point out, that
human observation is less implacable than video surveillance.
But we can find no principled basis for assigning constitutional
significance to that divagation. Both methods human
observation and video surveillance perform the same function.
Thus, videotaping per se does not alter the constitutional
perspective in any material way.

15

2.7(f) (stating that individuals can record what is readily

observable from a nonintrusive viewing area).

The bottom line is that since PRTC could assign humans

to monitor the work station continuously without constitutional

insult, it could choose instead to carry out that lawful task by

means of unconcealed video cameras not equipped with microphones,

which record only what the human eye could observe.

D. The Appellants' Other Fourth Amendment Arguments. D. The Appellants' Other Fourth Amendment Arguments. 

The appellants trot out a profusion of additional

asseverations in their effort to convince us that continuous

video surveillance of the workplace constitutes an impermissible

search. First, invoking Orwellian imagery, they recite a

catechism pasted together from bits and pieces of judicial

pronouncements recognizing the intrusive nature of video

surveillance. These statements are taken out of context.

Without exception, they refer to cameras installed

surreptitiously during the course of criminal investigations.

See, e.g., United States v. Mesa-Rincon, 911 F.2d 1433, 1442 

(10th Cir. 1990); United States v. Cuevas-Sanchez, 821 F.2d 248, 

251 (5th Cir. 1987); Hawaii v. Bonnell, 856 P.2d 1265, 1276-77 

(Haw. 1993). Concealed cameras which infringe upon the rights of

criminal defendants raise troubling constitutional concerns 

concerns not implicated by the employer's actions in this case.

By like token, the appellants' attempts to analogize

video monitoring to physical searches are unavailing. The silent

video surveillance which occurs at the Center is less intrusive

16

than most physical searches conducted by employers. PRTC's

stationary cameras do not pry behind closed office doors or into

desks, drawers, file cabinets, or other enclosed spaces, but,

rather, record only what is plainly visible on the surface.

Sounds are not recorded; thus, the cameras do not eavesdrop on

private conversations between employees. And while the Court

occasionally has characterized the taking of pictures as a

search, it is a constitutionally permissible activity if it does

not transgress an objectively reasonable expectation of privacy.

See, e.g., Dow Chem. Co. v. United States, 476 U.S. 227, 238-39 

(1986) (upholding a search by aerial camera when the photographs

taken were limited to the outline of the surveilled plant's

buildings and equipment, even though the photos revealed more

detail than could be seen by the human eye).

Next, the appellants complain that while at work under

the cameras' unrelenting eyes they cannot scratch, yawn, or

perform any other movement in privacy. This complaint rings

true, but it begs the question. "[T]he test of legitimacy is not

whether a person chooses to conceal assertedly `private'

activity," but whether the intrusion is objectively unreasonable.

Oliver, 466 U.S. at 182-83; accord California v. Ciraolo, 476 

U.S. 207, 212 (1986).

Finally, the appellants tout the potential for future

abuse, arguing, for example, that PRTC might expand video

surveillance "into the restrooms." Certainly, such an extension

would raise a serious constitutional question. See, e.g., People 

17

v. Dezek, 308 N.W.2d 652, 654-55 (Mich. Ct. App. 1981) (upholding 

a reasonable expectation of privacy against video surveillance in

restroom stalls). But present fears are often no more than

horrible imaginings, and potential privacy invasions do not 

constitute searches within the purview of the Fourth Amendment.

See Dow Chem., 476 U.S. at 238 n.5; United States v. Karo, 468 

U.S. 705, 712 (1984).

We have said enough on this score. The appellants have

failed to demonstrate the existence of an issue of material fact

sufficient to withstand summary judgment on their Fourth

Amendment claim. Because they do not enjoy an objectively

reasonable expectation of privacy against disclosed, soundless

video surveillance while at work, they have no cause of action

under the Fourth Amendment.7

IV. THE RIGHT OF PRIVACY IV. THE RIGHT OF PRIVACY

In addition to their Fourth Amendment claim, the

appellants contend that the Constitution spawns a general right,

in the nature of a privacy right, to be free from video

surveillance in the workplace.8 We do not agree.

Although the Constitution creates no free-floating
 

7In light of this conclusion, we need not reach the question
of whether the intrusion attributable to PRTC's video monitoring
is reasonable under the circumstances. See O'Connor, 480 U.S. at 
725-26.

8As presented in this proceeding, this claim necessarily
rises or falls on principles of federal constitutional law. We
are aware both that privacy interests are somewhat more zealously
guarded by Puerto Rican norms, see, e.g., P.R. Const. art. II,  
1, 7, and that the appellants have a parallel suit pending in the
local courts.

18

right to privacy, see Katz, 389 U.S. at 350-51, specific 

guarantees may create protectable zones of privacy. See Paul v. 

Davis, 424 U.S. 693, 712-13 (1976); Roe v. Wade, 410 U.S. 113, 

152-53 (1973). Thus, the appellants' privacy claim cannot

prosper unless it is anchored in an enumerated constitutional

guaranty.

The Fourth Amendment obviously is unavailable for this

purpose. See supra Part III(C) & (D). The appellants' effort to 

introduce the Ninth Amendment is similarly misdirected. The

Ninth Amendment which stipulates that "the enumeration in the

Constitution of certain rights, shall not be construed to deny or

disparage others retained by the people" does not create

substantive rights beyond those conferred by governing law. See 

Gibson v. Matthews, 926 F.2d 532, 537 (6th Cir. 1991); see also 

John E. Nowak & Ronald D. Rotunda, Constitutional Law 11.7 (5th 

ed. 1995) (observing that "the Ninth Amendment has not been used

as the basis for defining rights of individuals") (collecting

cases).

The appellants' privacy claim thus hinges upon a right

to privacy which has its origin in the Fourteenth Amendment's

concept of personal liberty.9 Such privacy rights do exist, see 

Roe, 410 U.S. at 152, but they have been limited to fundamental 

rights that are implicit in the concept of an ordered liberty.

See Paul, 424 U.S. at 713. On the facts of this case, the right 
 

9The Fourteenth Amendment guarantees, inter alia, that no 
state shall "deprive any person of life, liberty, or property,
without due process of law." U.S. Const. amend. XIV, 1.

19

to be free from disclosed video surveillance while at work in an

open, generally accessible area does not constitute a fundamental

right.

The courts have identified two clusters of personal

privacy rights recognized by the Fourteenth Amendment. One

bundle of rights relates to ensuring autonomy in making certain

kinds of significant personal decisions; the other relates to

ensuring the confidentiality of personal matters. See Whalen v. 

Roe, 429 U.S. 589, 598-600 (1977); Borucki v. Ryan, 827 F.2d 836, 

840 (1st Cir. 1987). PRTC's monitoring does not implicate any of

these rights.

The autonomy branch of the Fourteenth Amendment right

to privacy is limited to decisions arising in the personal sphere

matters relating to marriage, procreation, contraception,

family relationships, child rearing, and the like. See Paul, 424 

U.S. at 713; Griswold v. Connecticut, 381 U.S. 479, 485-86 

(1965). The type of privacy interest which arguably is

threatened by workplace surveillance cannot be shoehorned into

any of these categories. Because the appellants do not challenge

a governmental restriction imposed upon decisionmaking in

uniquely personal matters, they cannot bring their claim within

the reach of the "autonomy" cases.

The appellants' argument is no stronger under the

confidentiality bough of the Fourteenth Amendment right to

privacy. Even if the right of confidentiality has a range

broader than that associated with the right to autonomy, but cf. 

20

Borucki, 827 F.2d at 841-42 (suggesting that the right of 

confidentiality protects only information relating to matters

within the scope of the right to autonomy), that range has not

extended beyond prohibiting profligate disclosure of medical,

financial, and other intimately personal data. See id. at 841 

n.8 & 842 (collecting cases). Any data disclosed through PRTC's

video surveillance is qualitatively different, if for no other

reason than that it has been revealed knowingly by the appellants

to all observers (including the video cameras). This information

cannot be characterized accurately as "personal" or

"confidential."

The appellants also appear to rely upon the substantive

component of the Due Process Clause as a source of the envisioned

privacy right. To this extent, they are whistling past the

graveyard. The boundaries of substantive due process analysis

are not sufficiently flexible to accommodate the appellants'

claim. See, e.g., Paul, 424 U.S. at 713 (declining to enlarge 

the scope of substantive due process to include a privacy

interest in preventing publication of a person's arrest record);

see generally Collins v. City of Harker Heights, 503 U.S. 115, 

125 (1992) (expressing reluctance "to expand the concept of

substantive due process").

Insofar as this claim invites a substantive due process

analysis by purporting to challenge the existence of a rational

relationship between PRTC's video surveillance and its legitimate

needs qua employer, the claim is a non-starter. Even if we leave 

21

security concerns to one side,10 video surveillance is a rational

means to advance the employer's legitimate, work-related interest

in monitoring employee performance. See O'Connor, 480 U.S. at 

724 ("[P]ublic employers have a direct and overriding interest in

ensuring that the work of the agency is conducted in a proper and

efficient manner."); Alinovi v. Worcester Sch. Comm., 777 F.2d 

776, 782 (1st Cir. 1985) (stating that an employee's privacy

interest may be lessened due to a "supervisor's legitimate

oversight responsibilities and the special duties that may be

owed by the employee by virtue of his employment").

V. LEAVE TO AMEND V. LEAVE TO AMEND

In a last-ditch effort to save the day, the appellants

assert that the district court should have granted them leave to

amend and that its failure to do so requires vacation of the

judgment. The assertion is meritless.

The short, dispositive answer to the appellants' plaint

is that they never sought permission to amend in the court below.

See Beaulieu v. United States IRS, 865 F.2d 1351, 1352 (1st Cir. 

1989) ("[I]t is a party's first obligation to seek any relief

that might fairly have been thought available in the district

court before seeking it on appeal."). The slightly longer but

equally dispositive answer is that where, as here, plaintiffs

 

10The appellants berate the district court for taking
improper judicial notice of the Center's role in assisting law
enforcement agencies authorized to perform wiretaps. Our review
has been plenary, and whether PRTC coordinates wiretaps does not
bear on our analysis. Accordingly, any error in this regard was
harmless.

22

elect to stand upon their complaint and appeal from an adverse

judgment, we have been exceedingly reluctant to direct the trial

court to permit amendment upon affirmance of the judgment. See, 

e.g., Dartmouth Review v. Dartmouth Coll., 889 F.2d 13, 23 (1st 

Cir. 1989). Nothing in this case warrants a deviation from that

sound praxis. The facts necessary to support the entry of

judgment are undisputed and the appellants have not adverted to

any additional facts which, if inserted into the record, could

breathe new life into their moribund federal claims. Under such

circumstances, leave to amend would be an empty exercise. See 

Correa-Martinez v. Arrillaga-Belendez, 903 F.2d 49, 59 (1st Cir. 

1990); Dartmouth Review, 889 F.2d at 23. 

VI. CONCLUSION VI. CONCLUSION

We need go no further. Because the appellants do not

have an objectively reasonable expectation of privacy in the open

areas of their workplace, the video surveillance conducted by

their employer does not infract their federal constitutional

rights. PRTC's employees may register their objections to the

surveillance system with management, but they may not lean upon

the Constitution for support.

Affirmed. Affirmed. 

23