Fiol Matta, Jueza Ponente
TEXTO COMPLETO DE LA SENTENCIA
Se nos solicita que revisemos la resolución emitida por el Oficial Examinador de la Autoridad de Energía Eléctrica el 11 de agosto de 2000 que ordenó a la Autoridad de Energía Eléctrica reclasificar al Sr. Rafael Pagán Segarra a la clase de Auditor Interno in y al Sistema de Retiro de la Autoridad de Energía Eléctrica, hacer los ajustes cónsonos con dicha determinación. Por los fundamentos expuestos en esta resolución, confirmamos la determinación recurrida.
*928 El 13 de julio de 1987, el señor Rafael Pagán Segarra (en adelante, "Pagan"), quien ocupaba un puesto de Auditor Interno III en la Autoridad de Energía Eléctrica (en adelante, "la Autoridad"), completó y firmó un formulario titulado "Cuestionario de Clasificación para Plazas Gerenciáles" que había sido preparado por la Autoridad con la intención de efectuar una revisión del plan de clasificación existente para los empleados gerenciáles. El Director Ejecutivo de la Autoridad nombró un comité á dichos efectos, compuesto de personas especializadas en el campo de la clasificación y retribución de personal. La estructura diseñada por el comité entró en vigor el 9 de julio de 1989 y el puesto que ocupaba Pagán fue asignado a la clase de Auditor Interno II. Tanto la antigua clase de Auditor Interno III como la nueva clase de Auditor Interno II pertenecían al grado M-V, por lo que el sueldo de Pagán no fue modificado. Ejerciendo el derecho que le fue concedido al implantarse el plan de clasificación, Pagán solicitó a la Autoridad que revisara la clasificación de su puesto, el 24 de junio de 1991. Poco después, el 17 de agosto de 1991, Pagán fue jubilado por incapacidad física no relacionada al empleo, luego de estar ausente desde mediados de mayo de 1990. Otros cinco empleados en idéntica situación a la de Pagán, quienes también solicitaron la corrección de la clasificación de sus puestos, llegaron a un acuerdo con la Autoridad, subsistiendo únicamente la reclamación de autos.
A base de la prueba recibida durante la vista celebrada el 30 de mayo de 2000, el Oficial Examinador resolvió que Pagán había indicado en el Cuestionario de Clasificación que, además de los deberes correspondientes al puesto que ocupaba de Auditor Interno III descritos en la Codificación de Clase M53500, también examinaba y verificaba las reclamaciones que sometían los proveedores de servicios médicos por servicios rendidos a los subscriptores o sus familiares cubiertos por el seguro médico y registraba electrónicamente los resultados de dicho examen. Además, que en cuanto al alcance y complejidad del trabajo, Pagán marcó el encasillado que indicaba que su trabajo incluía, normal y frecuentemente, el uso de "juicio considerable en la aplicación de la experiencia para crear y desarrollar técnicas para solucionar problemas”', que en el área de discernimiento marcó el encasillado que indicaba que usaba "juicio independiente considerable" y que sus errores podían causar atrasos significativos, pérdida de tiempo, materiales o equipo, que generalmente serían descubiertos luego de ocurrido el daño y que podían afectar la imagen de la Autoridad; también indicó que no le aplicaba el inciso de supervisión de empleados. El Oficial Examinador verificó que el supervisor aceptó la descripción dada por el empleado como exacta y completa, y así lo certificó con su firma.
El Oficial Examinador también estimó probado que uno de los factores que se consideró en la reclasificación del empleado era el trabajo que venía desempeñando antes del Plan de Clasificación, según éste se exponía en el cuestionario de clasificación y que el puesto de Auditor Interno III mantuvo los mismos deberes en ambos planes de clasificación, cambiando solamente en cuanto al número de codificación. Sobre la estructura de la Oficina de Auditoría, el Oficial Examinador encontró que ésta contaba con personal de varias clases a nivel ejecutivo y gerencial, entre ellas la de Auditor Interno II y Auditor Interno III; que luego de implantarse el 'Plan de Clasificación, dicha oficina sustituyó la clase de Auditor Principal con la de Auditor Interno III, ubicada en el grado MVI y que los ocupantes de la clase de Auditor Interno III pasaron a la clase de Auditor Interno II, ubicada en el grado MV, junto con los que pertenecían a la clase de Auditor Interno II antes de la implantación del plan. Sobre las características de dichas clases, determinó que los empleados pertenecientes a la antigua clase de Auditor Interno III realizaban, según su Carta de Deberes, "trabajo especializado de naturaleza compleja" en materia de auditoría intema y "de intervención de las actividades operacionales, de contabilidad y financieras de la Autoridad". Agregó que el nuevo plan de clasificación agrupó a los ocupantes de la antigua clase de Auditor Interno III bajo la nueva clase de Auditor Interno II, cuya Carta de Deberes describía su trabajo como de naturaleza moderadamente compleja y que la naturaleza compleja del trabajo había pasado a formar parte de la Carta de Deberes de la nueva clase de Auditor Interno III. Sobre las Cartas de Deberes, el Oficial Examinador encontró probado que la correspondiente a la clase de Auditor Interno III anterior a 1989 incluía 22 ejemplos ilustrativos del trabajo, mientras que la correspondiente a la clase de Auditor Interno II en el nuevo plan de clasificación incluía 14.
Del análisis de la prueba y de las disposiciones pertinentes del "Reglamento de Personal Empleados de *929 Carrera No Unionados", en vigor desde el 9 de septiembre de 1988 (en adelante, "el Reglamentó"), a la luz de la decisión del Tribunal Supremo de Puerto Rico en Mercado Vega v. U.P.R., 128 D.P.R. 273 (1991), el Oficial Examinador concluyó que la Autoridad debió haber reclasificado a Pagán a la Clase de Auditor Interno III desde el 9 de julio de 1989, fecha en que entró en vigor la nueva estructura de clasificación de puestos, hasta el 17 de agosto de 1991, fecha en que cesó en su empleo. Fundamentó su determinación en que las funciones de naturaleza compleja que Pagán desempeñaba fueron asignadas a la clase de Auditor Interno III bajo el nuevo plan y que la Autoridad reclasificó a dicha Clase a los demás ocupantes de puestos de Auditor Interno II que así lo solicitaron. También dio peso a que el Administrador de la Oficina de Auditoría había certificado que era correcta la descripción ofrecida por Pagán, y mediante comunicación de 1 de noviembre de 1990, había solicitado la reclasificación del puesto. Resolvió, además, que la licencia por enfermedad otorgada a Pagán era irrelevante a la solicitud y que su testimonio "incontrovertible" demostró que sus deberes eran en realidad los correspondientes a la clase de Auditor Interno III. La Autoridad solicitó reconsideración oportunamente, la cual fue denegada el 5 de septiembre de 2000.
El 5 de octubre de 2000, la Autoridad sometió el recurso de epígrafe, en el que señala que el- Oficial Examinador erró al determinar que Pagán realizaba las funciones de la clase de Auditor Interno III y al ordenar su reclasificación. La Autoridad alega que la determinación del Oficial Examinador no está apoyada por la prueba que desfiló en la vista administrativa. Además, alega que las funciones cuyo desempeño alegadamente ameritaban la reclasificación del puesto de Pagán estaban enmarcadas en las funciones de Auditor Interno II, clase que había resultado de la fusión de las antiguas clases de Auditor Interno II y Auditor Interno III, la segunda de las cuales había sufrido cambios en su naturaleza, aspectos distintivos y ejemplos ilustrativos del trabajo, antes de implantarse el nuevo plan de clasificación. En tercer lugar, alega que la prueba testifical presentada por la Autoridad fue específica y que Pagán no aportó prueba adicional a su propio testimonio, ni controvirtió la presunción de legalidad y corrección de su nueva clasificación, al basarse en las funciones que realizaba antes de implantarse el nuevo estudio de clasificación, las cuales, según la prueba pericial de la Autoridad, estaban enmarcadas en la nueva clase de Auditor Interno II. Por último, aduce que el Oficial Examinador no debió tomar en consideración la reclasificación de los puestos de otros empleados que-estaban ubicados en la misma clase que el de Pagán antes de entrar en vigor el nuevo plan de clasificación y que dicho funcionario no consideró la totalidad de la prueba que tuvo ante sí. En resumen, argumenta que la determinación del Oficial Examinador es irrazonable y no se sostiene a la luz de la prueba.
II
Es norma trillada en nuestro sistema de derecho que las conclusiones e interpretaciones de los organismos administrativos especializados merecen gran consideración y respeto y que el criterio a aplicarse en la revisión judicial es el de razonabilidad, "distinguiendo entre 'cuestiones de interpretación estatutaria, en las que los tribunales son especialistas, y cuestiones propias para la discreción o pericia administrativa'." Adorno Quiles v. Hernández, 126 D.P.R. 191, 195 (1990). Así, los tribunales deben ceñirse a indagar sobre la razonabilidad de la decisión administrativa y revocarla sólo cuando determinen que la agencia actuó arbitraria o ilegalmente o en forma tan irrazonable que su actuación constituyó un abuso de discreción. Véanse, entre otros: Quiñones Irizarry v. San Rafael Estates, S.E., op. de 30 de junio de 1997, 97 J.T.S. 109, en la pág. 1329; Murphy Bernabé v. Tribunal Superior, 103 D.P.R. 692 (1975); Facultad para las Ciencias Sociales Aplicadas, Inc. v. Consejo de Educación Superior, 89 D.P.R. 397, 405 (1963), y los casos allí citados.
También está firmemente establecido en nuestro derecho administrativo que las determinaciones de hechos de las agencias merecen gran deferencia, siempre y cuando estén sostenidas por evidencia sustancial que obre en el expediente administrativo. Sección 4.5 de la Ley 170 de 12 de agosto de 1988, según enmendada, conocida como la Ley de Procedimiento Administrativo Uniforme (LPAU), 3 L.P.R.A. see. 2175. Por regla general, "los tribunales no intervendrán con las determinaciones de hechos de un organismo administrativo si las mismas están sostenidas por evidencia sustancial que surja del expediente administrativo considerado en su totalidad". Metropolitana, S.E. v. A.R.P.E., 138 D.P.R. 200, 213 (1995). Evidencia sustancial es "aquella evidencia relevante que una mente razonable podría aceptar como adecuada para sostener una conclusión". *930 Hilton Hotels v. Junta de Salario Mínimo, 74 D.P.R. 670 (1953). Para que un tribunal pueda determinar que la evidencia en el expediente administrativo no es sustancial, es necesario que la parte afectada demuestre que existe "otra prueba en el récord que razonablemente reduzca o menoscabe el peso de tal evidencia hasta el punto que un tribunal no pueda, concienzudamente, concluir que la evidencia sea sustancial, en vista de la totalidad de la prueba presentada... y hasta el punto de que se demuestre claramente que la decisión... no está justificada por una evaluación justa del peso de la prueba". Id., a las págs. 686-687 (1953).
Aún así, ni la presunción de corrección es absoluta, ni los poderes delegados a las agencias son ilimitados. Al contrario, los dictámenes administrativos no están libres del escrutinio judicial y los tribunales estamos llamados a revocar las determinaciones administrativas, cuando éstas "infrinjan directamente valores constitucionales fundamentales, [o] cuando las actuaciones de estos organismos sean claramente arbitrarias". Henríquez v C.E.S., 120 D.P.R. 194 (1987). Por otra parte, entre otros parámetros de su marco de acción, las agencias deben aprobar reglamentos que delimiten o precisen sus facultades al amparo de la ley, evitando así actuaciones administrativas ilegales o arbitrarias. Id. Una vez el organismo ha ejercido esta facultad en el área de administración de personal, "[njo puede quedar a la soberana voluntad de la agencia reconocer o no derechos de esta clase que ella misma les ha extendido por reglamento a sus empleados." García Troncoso v. Administración del Derecho al Trabajo, 108 D.P.R. 53, 57 (1978); Hernández García v. J.R.T., 94 D.P.R. 22 (1967).
Nuestro ordenamiento jurídico recoge una política pública muy clara, cuyo objetivo es que el mérito sea el criterio rector en el reclutamiento, selección, ascenso, traslado, descenso, clasificación de puestos, adiestramiento y retención de los empleados del servicio público. Olivieri Morales v. Pierluisi, 113 D.P.R. 790 (1983). De esa política pública, expuesta en la Ley de Personal del Servicio Público, Ley Núm. 5 de 14 de octubre de 1975, 3 L.P.R.A. sees. 1301 y sigs., surge el objetivo de asegurar "que sean los más aptos los que sirvan al Gobierno y que todo empleado sea seleccionado, adiestrado, ascendido y retenido en su empleo en consideración al mérito". 3 L.P.R.A. sees. 1311(1); Martínez Conde v. Departamento de Educación, 99 J.T.S. 105 (Res. el 25 de junio de 1999); véanse, además, Torres Solano v. P.R.T.C., 127 D.P.R. 499 (1990); Torres Ponce v. Jiménez, 113 D.P.R. 58 (1982). La sección 2.1(2) de dicho estatuto extendió el principio de mérito a los empleados de corporaciones públicas que no pertenezcan a una unidad apropiada de negociación colectiva. 3 L.P.R.A. see. 1311(2), 1338(4); Reyes Coreano v. Director Ejecutivo, 110 D.P.R. 40, 49 (1980).
Entre las áreas esenciales al principio de mérito, enumeradas en la sec. 4.1 de la citada Ley de Personal, se encuentra la clasificación de puestos. 3 L.P.R.A. see. 1331(1). Al referirse de modo específico a la clasificación de puestos, la sección 4.2 de la Ley de Personal establece, como mecanismo de adelantar el principio de mérito, "una estructura racional de funciones que propenda a la mayor uniformidad posible y que sirva de base para las diferentes acciones de personal". Dispone, además, que se tomará en consideración la naturaleza y complejidad de las funciones, no sólo para agrupar puestos en determinadas clases, sino para determinar la jerarquía relativa entre las distintas clases y para la asignación de éstas al tipo mínimo de retribución, de manera que se mantengan diferencias razonables en salarios. 3 L.P.R.A. see. 1332 (3), (9) y (10).
En la actualidad, la evaluación de puestos es la piedra angular del programa de sueldos y salarios. Su postulado básico de "igual paga por igual trabajo”, está consagrado en la Constitución de Puerto Rico y en la Ley Federal de Igual Paga por Igual Trabajo, 29 U.S.C. see. 201 y sigs. Con dicho postulado básico, la evaluación de puestos representa una solución al problema de desigualdades en la remuneración, mediante el cual se determina el valor de un cargo y el nivel de salario que el mismo justifica. A. de la Luz, Recursos Humanos en la Empresa, San Juan, Puerto Rico, Estudio Gráfico Universal, 1992, págs. 457, 459. Por otra parte, si bien es cierto que lo relativo a la evaluación y clasificación de puestos no siempre es susceptible de medirse mecánicamente mediante el uso de fórmulas o criterios estandarizados, la utilización de métodos sistemáticos permite comparar y valorar las distintas funciones y responsabilidades que un puesto acarrea dentro de una entidad particular. Para determinar el valor o la puntuación que se le asigna a una posición, se toman en cuenta factores tales como habilidad, esfuerzo, responsabilidad y condiciones de trabajo. Id., págs. *931 473-474.
Así, pues, la descripción escrita de los puestos y de las clases de puestos adviene necesaria en cuanto forma parte del área de clasificación de puestos, la cual, a su vez, resulta esencial al principio de mérito. Ahora bien, la clasificación de puestos es una prerrogativa gerencial del patrono, pues se trata de un instrumento para la administración de los recursos humanos. Le corresponde a la autoridad nominadora la plena facultad de determinar cuáles son los puestos necesarios para realizar la misión de la agencia, y cuáles son las funciones a realizar y los requisitos que debe tener el incumbente de un puesto específico. Aunque por virtud del principio de mérito cada empleado tiene derecho a ser correctamente clasificado, la facultad de la autoridad nominadora en la zona de clasificación de puestos, aunque no absoluta, es muy amplia. Mercado Vega v. U.P.R., 128 D.P.R. 273, 285 (1991); Véase, sección 4.2 de la Ley de Personal del Servicio Público de Puerto Rico, 3 L.P.R.A. see. 1332.
El "Reglamento Empleados de Carrera no Unionados" de la Autoridad, en vigor desde el 9 de septiembre de 1988, exige que se preparen descripciones por escrito de cada puesto y clase de puestos. El mismo incorporaba, en su preámbulo, los principios de mérito e igualdad de oportunidades de empleo. Cada empleado, al ingresar a la plantilla de la Autoridad, era asignado a un puesto, que a su vez era asignado a una clase. Por "clase", la Autoridad entendía "todos los puestos que sean iguales o sustancialmente similares en cuanto a sus características; es decir, a la naturaleza y complejidad de sus deberes y al grado de responsabilidad y autoridad asignado". Reglamento, sección 5.2. Cada clase contaba con una especificación, la cual incluía "una descripción clara y precisa de aquellas características básicas comunes a los puestos que la componen, así como de otros elementos básicos necesarios para una clasificación correcta; y de los requisitos mínimos exigidos tales como conocimientos, experiencia, habilidades y destrezas". Id., sección 5.3. Dichas especificaciones eran el instrumento básico de la clasificación y reclasificación de puestos. Id., sección 5.3.1. Las clases así definidas eran asignadas, en el Plan de Retribución, a diversas escalas salariales según la relación jerárquica entre ellas, de modo que "cada empleado sea compensado justa y equitativamente de acuerdo con las características del puesto que ocupe". Id., sección 5.4.
El Plan de Clasificación debía ser revisado cada tres años mediante el uso del Cuestionario de Clasificación de Plazas Gerenciales. Id., sección 5.1. El Reglamento definía "reclasificación" como "[mjodificar un puesto a otro de un nivel igual, inferior o superior", Id., sección 22.30; sin embargo, no establecía las circunstancias que daban lugar a la reclasificación de un puesto, como tampoco lo hizo el Plan de Clasificación y Valoración de Puestos Gerenciales de 1989. La norma vigente para el servicio público establece que los puestos pueden ser reclasificados, entre otras ocasiones, cuando haya una modificación en el plan de clasificación. En dichos casos, "no existen necesariamente cambios significativos en las descripciones de los puestos, pero en el proceso de mantener al día el Plan de Clasificación mediante la consolidación, segregación, alteración, creación y eliminación de clases, surge la necesidad de cambiar la clasificación de algunos puestos". Oficina Central de Asesoramiento Laboral y Administración de Recursos Humanos, Reglamento de Personal, Areas Esenciales del Principio de Mérito, sección 6.2(2). Esta definición es idéntica a la establecida en la sección 5.4.1 del "Reglamento de Personal, Empleados de Carrera no Unionados" de la Autoridad, el cual entró en vigor el 9 de septiembre de 1992 y reemplazó al Reglamento de 1988.
En la Autoridad, si una reestructuración organizational añadía deberes, responsabilidades o requisitos al puesto, el salario resultante de una reclasificación de puesto que representara un ascenso de un grado (siempre que el grado resultante no fuera mayor de M-6), era el "nivel de sueldo que inmediatamente precede al que ostente antes del cambio" de la escala correspondiente a la clase al cual se Teclasifica el puesto. Reglamento, sección 5.6.1. El Reglamento de 1988 disponía que las determinaciones de la Autoridad, en cuanto a clasificación de puestos, eran apelables ante el Comité de Apelaciones de la Autoridad, cuyas determinaciones, a su vez, eran revisables judicialmente. Id., sección 15.1.
Según las normas expuestas, el cuestionario de clasificación de plazas gerenciales y la descripción escrita *932 de los puestos son fundamentales para la resolución de la presente controversia. En el caso de autos, Pagán completó un cuestionario de clasificación en el que identificó como parte de sus funciones una serie de tareas adicionales a las del puesto que ocupaba y describió el alcance y complejidad de estas funciones, así como el alto nivel de juicio que debía ejercer y el impacto significativo de su trabajo en las operaciones de la empresa. Además, especificó que las funciones que realizaba requerían preparación académica de bachillerato, más cursos suplementarios en contabilidad, auditoría y "EDP", así como de cuatro a cinco años de experiencia en trabajos de intervención. La declaración de Pagán fue certificada como una descripción exacta y completa de los deberes, responsabilidades y demás características del puesto, por su supervisor inmediato y por el Jefe de Departamento, sin excepciones, ni adiciones. En su testimonio ante el Oficial Examinador, a quien le mereció entera credibilidad, Pagán declaró que como Auditor Interno 1131 realizaba las tareas descritas en la carta de deberes de dicha clase, que había estado a cargo de los grupos que auditaban el Plan Médico Cruz Azul por algunos años y que diseñó e implantó el sistema computadorizado para los resultados de los exámenes realizados en dichas intervenciones. Añadió que le parecía que las cartas de deberes del puesto que ocupaba y la de la nueva clase de Auditor Interno III, eran idénticas en cuanto a la naturaleza y aspectos y los ejemplos ilustrativos, que cumplía los requisitos de la nueva clase de Auditor Interno HI y que realizaba los deberes enumerados en la carta de deberes de dicha clase desde antes de la implantación del plan de clasificación de 1989. En contrainterrogatorio, declaró que el trabajo de Cruz Azul se llevaba a cabo más de cuatro meses al año y que había otro Auditor Interno III que coordinaba el trabajo a manera de verificación.
La prueba que obra en el expediente demuestra que el Administrador de Auditoría Interna expresó preocupación por la clasificación de los puestos gerenciales a signados a su oficina, el 23 de agosto de 1989, es decir, menos de dos meses después de implantado el plan de clasificación. En su respuesta del 25 de mayo de 1990, el Jefe interino de la División de Personal de Relaciones Industriales aludió a la información suministrada en los cuestionarios de clasificación para justificar "que los trabajos asignados y realizados por los Auditores II y III son de complejidad y grado de dificultad similar, así como otros aspectos relacionados con los puestos que son igualmente similares... La única diferencia encontrada entre ambas clases fue el requisito de experiencia. [...]”. (Enfasis nuestro). La carta concluye expresando que "...no compartimos su opinión en que [sic] los cambios efectuados alteran la organización existente, sino que la misma se mantiene exceptuando el hecho de que la mayoría de las clases subieron en clasificación... nos reiteramos en la opinión [de] que las clasificaciones otorgadas a los puestos gerenciales en la oficina de Auditoría Interna son correctas conforme a la información recopilada hasta estos momentos." (Corchetes y énfasis nuestros).
En apoyo de su determinación, la Autoridad presentó en la vista administrativa el testimonio pericial de la señora Ligia Benitez del Campo, Analista del Departamento de Clasificación y Retribución de la Autoridad, a la fecha de la vista, quien, entre otras cosas, indicó que los ocupantes de la antigua clase de Auditor Interno III no sufrieron cambio en su gradación, ni en salario, sino en el título de la cíase, aunque la Autoridad había reducido el nivel de complejidad, discreción y juicio independiente de sus funciones, y había eliminado o consolidado algunos de sus deberes. En cuanto al caso de autos, la señora Benitez testificó que las funciones adicionales descritas por Pagán en el cuestionario de clasificación estaban incluidas en la carta de deberes de la nueva clase de Auditor Interno II, pero aceptó que ésta tenía una cantidad menor de funciones que la antigua clase de Auditor Interno III.
Un examen de las cartas de deberes correspondientes a la clases de Auditor Interno III anterior a la implantación del plan de clasificación y las de Auditor Interno II y Auditor Interno III posteriores a ésta, nos convencen de que las determinaciones de hechos del Oficial Examinador están fundamentadas en la prueba. Las características distintivas de la clase de Auditor Interno IE anterior a 1989 se resumen, según su carta de deberes, en que constituye "trabajo especializado de naturaleza compleja". Estas características y nivel de complejidad fueron mantenidas en la nueva clase del mismo nombre. El testimonio de la perito de la Autoridad tiende a demostrar que la clase de Auditor Interno II creada en 1989 incluia puestos cuyos ocupantes realizaban tareas de menor complejidad y responsabilidad que las realizadas por los ocupantes de los puestos de la antigua clase de Auditor Interno III. Esto refuerza la conclusión a la que aquí llegamos, toda vez que el proceso de *933 revisión del plan de clasificación, el cual por disposición reglamentaria se realiza a base del cuestionario de clasificación, persigue atemperar las cartas de deberes a la realidad de los puestos, no despojar de funciones a los empleados que los ocupan. No podemos perder de vista que, tanto ante los cuestionamientos del Director de la Oficina de Auditoría como en la prueba pericial que ofreció en la vista administrativa, la Autoridad justificó su posición a base del cuestionario de clasificación firmado por Pagán y certificado por sus superiores, el cual, contrario a lo alegado por la Autoridad, manifiesta que Pagán desempeñaba funciones de la complejidad y criterio propio que describía la carta de deberes de la antigua clase de Auditor Interlio III y que fueron asignadas a la nueva clase de Auditor Interno III.
En resumen, la Autoridad no pudo establecer, respecto a la reclasificación de Pagán, un "patrón de lógica interna" o motivo racional que justificara sus actuaciones, ingrediente esencial en una clasificación que responda al principio de mérito. 3 L.P.R.A. see. 1332(9). La prueba presentada por la Autoridad no estableció motivo alguno para justificar la clasificación del señor Pagán como Auditor Interno n, ni pudo justificar el proceso de análisis mediante el cual en el nuevo Plan de Clasificación se le asignó al señor Pagán el puesto de Auditor Interno II. La Autoridad tampoco contradijo el testimonio de Pagán respecto a las tareas y naturaleza del trabajo, el nivel de complejidad de dichas tareas y funciones, el grado de dificultad de las funciones y el nivel de autoridad que Pagán ejercía en el puesto que ocupaba antes de la nueva clasificación. Aunque la clasificación de puestos sea una prerrogativa gerencial, la misma no es absoluta y todo empleado tiene derecho a ser correctamente clasificado. Ante la ausencia de una explicación racional que fundamente la determinación de la Comisión y ante un análisis de las especificaciones de las clases en controversia que demuestre que las funciones del señor Pagán corresponden a la clase de Auditor, Interno II, resolvemos que no erró el Oficial Examinador al resolver que el recurrente fue mal clasificado como tal y que le correspondía ser clasificado como Auditor Interno III.
Por los fundamentos expuestos, se expide el auto y se confirma la resolución recurrida.
Lo acordó y manda el Tribunal y lo certifica la Secretaria General.
Aida Ileana Oquendo Graulau
Secretaria General
ESCOLIOS 2002 DTA 46
1. Dentro del factor "habilidad" se considera la formación académica requerida para desempeñar determinado trabajo o el adiestramiento, así como el tiempo de experiencia necesario para que un trabajador llegue a ejecutar el mismo satisfactoriamente. El factor "esfuerzo" mide las exigencias físicas y mentales requeridas para poder desempeñar cierta labor. Por otro lado, el factor "responsabilidad" se encarga de ponderar las obligaciones del empleado en torno a equipo, materiales, supervisión, la seguridad de otros trabajadores en el lugar de trabajo, etcétera. Por último, “condiciones de trabajo" se refiere a las circunstancias en que debe realizarse el trabajo. El valor o puntuación asignado a cada uno de estos factores permite comparar las diferencias entre puestos en términos numéricos, reduce considerablemente los errores de juicio cuando se tienen que valorar los mismos y provee una mayor uniformidad de salarios a base de igual paga por igual trabajo. Id., págs. 483-488.
2. Ambas nuevas clases, la de Auditor Interno III y la de Auditor Interno II, testifican ante los foros pertinentes sobre sus tareas, adiestran Auditores Internos de menor clasificación y los dirigen e instruyen durante las intervenciones, ayudan y asesoran a auditores externos durante intervenciones de la Autoridad y se encargan de que se cumplan las normas y prácticas establecidas bajo el Programa de Calidad y Control de Pérdidas. Los integrantes de estas clases se distinguen entre sí porque los integrantes de la clase de Auditor Interno III dirigen y verifican el trabajo y los informes de Auditores Internos de menor clasificación, desarrollan técnicas y programas de adiestramiento para dichos empleados, verifican el cumplimiento de las recomendaciones efectuadas en dichos informes, sustituyen a su supervisor cuando se les requiera y participan en comités de trabajo, según designación de sus superiores y en la preparación del presupuesto operacional. Su testimonio ante los tribunales y otros foros es de naturaleza pericial. Los integrantes de la nueva clase de Auditor Interno II, mientras tanto, juegan un papel más limitado en la Autoridad, pues aunque determinan la dirección y alcance de sus *934 intervenciones internas, sólo participan en la planificación de los procedimientos de auditoría y en investigaciones especiales sobre irregularidades, recomiendan controles y estudia su efectividad, emiten opiniones sobre la efectividad y calidad de las actividades, discuten las deficiencias halladas con los supervisores de las unidades intervenidas y preparan informes escritos ofreciendo opiniones sobre la efectividad de los sistemas y procesos que se llevan a cabo. En fin, los Auditores Internos II ejercen funciones de naturaleza menos compleja y de discreción y juicio propio más limitados que los Auditores Internos III.